293 So.2d 830

**MORGAN COUNTY COMMISSION et al.**

v.

**Judge Newton B. POWELL et al.**

**SC 404.**

Supreme Court of Alabama.

April 4, 1974.

Robert Straub, Decatur, for appellees.

Julian Harris, Decatur, Truman Hobbs, Montgomery, for appellants.

Lusk & Lusk, Guntersville, amicus curiae for Alabama Association of Circuit Judges.

Oakley Melton, Jr., and Champ Lyons, Jr., Montgomery, amicus curiae for Association of County Commissions of Alabama.

HARWOOD, Justice.

In 1959, an Act was passed providing for the allowance of stenographic assistance to each judge of the Eighth Judicial Circuit. For convenience, this Act may be found as Section 125(28a), Title 13, Code of Alabama 1940 (pocket part). The Act reads:

"Section 1. Each judge of the Eighth Judicial Circuit is hereby authorized to employ such clerical or stenographic assistance as may be necessary to carry out the duties of his office. The salary of each clerk or stenographer employed hereunder by any circuit judge shall be fixed by such judge, subject to the approval of the county governing body of the county in which such judge resides, and shall be paid in equal monthly installments out of the county treasury of such county upon certification by the circuit judge.

"Section 2. This Act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law." (First Ex. Session, 1959.)

The salaries of the stenographers to the judges were fixed for several years by conferences between the judges and the Chairman of the County Commission. In fairly recent times, the stenographer of one of the judges left his employment to accept a better paying position with a local industry. This employee had not been replaced at the time of the proceedings below.

Sometime during the employment of the stenographers, the practice developed of fixing their compensation on a pay basis identical with that of certain other similar county employees. A merit system with job descriptions for county employees was later used.

On 31 July 1971, the County Commission by letter requested a tentative budget for the office of each judge. A joint budget was submitted pursuant to this request. Included in this tentative budget were items for secretarial salaries for each judge individually. These salaries ranged from $4,680.00 per annum for one judge, $6,192.00 for a second judge, and $7,200.00 for the third judge, depending on the seniority of the judge by whom the secretary was employed. By letter, the Chairman of the Commission notified the judges that the salaries of the secretaries for the judges would be in accordance with a survey that had been conducted by an employee of the State Personnel Board sometime before. The judges had offered no objection to this survey at the time it was

made, but specifically refused to be bound by the survey. The judges furnished the job surveyor with job descriptions, and outlines of the duties and responsibilities of their secretaries.

In this job survey, newly employed secretaries to the judges were classified as Clerk Steno II, Range 22, Step 1, at a salary of $348.00 per month. We find nothing in the record pertaining to the salary scale fixed in the survey for more experienced secretaries.

In a conference in January 1973, between the judges and the Chairman of the County Commission, the judges were informed that the proposed pay scale submitted by the judges in their tentative budget would not be accepted, and that the courts' secretaries would be paid as "Clerk-Typists." This salary scale was considerably less than that proposed in the judges' tentative budget.

It is recited in the decree rendered in this case that at the January 1973 conference:

"The Chairman * * * took the position that he [the Commission] had the authority to fix their [secretaries] compensation and the court must abide by his decision which he felt was fair and in accord with the survey made. The Presiding Judge took the position that the job description was tailored to fit the range rather than vice versa."

The pay of the secretaries continued to be in the amount fixed in the survey.

Upon the resignation of Judge Hundley's secretary in March 1973, he thereafter on 18 April 1973, requested a convocation of the judges for the purpose of conducting a wage survey which would reflect the reasonable worth of legal stenographic service in and around the Eighth Judicial Circuit so that it might be certified to the County Commission.

The presiding judge set the convocation for 20 April 1973, and requested that all three judges of the Eighth Judicial Circuit

make inquiry in their geographical areas as to the reasonable and fair worth of legal secretaries.

The three judges inquired of the four other courts in the area, of numerous attorneys in the circuit, and of the larger industries as to secretarial pay. The court then convened and made a detailed finding of fact and fixed the salaries of the secretaries in accordance with the evidence adduced as a result of the judges' inquiries. The Register was directed to certify these findings to the Commission for action "in accord with the common law pertaining to the inherent powers of a constitutional court and by the statute set forth above," i. e., Sec. 125(28a), Title 13, Code of Alabama 1940 (pocket part).

As above stated, this finding was rejected by the Commission.

On 27 April 1973, the court issued an order to the Commissioners to show cause why the proposed salary schedule for the judges' secretaries was not reasonable and why it should not be implemented.

This matter was set for hearing on 3 May 1973. At the hearing the Commissioners first moved that the three judges recuse themselves on the ground that "they have a personal interest in the matters involved." After an argument on this motion, it was denied, all three judges concurring.

. Thereupon the Commissioners filed a written answer. The answer, in parts pertinent to this appeal reads:

"Considering the total welfare of the County, its income, its obligations and required expenditures, the salary schedule of the stenographers and clerical employees of the other officers of the County required to be paid by the Commission and that of its own stenographers and clerical employees, it declined to approve the salary schedule submitted to it for approval by the Judges of the court.

"It will approve such schedule which may be submitted to it, fixed for Morgan County by the State Personnel Board for all stenographic and clerical employees of Morgan County."

The Commissioners declined to offer any evidence, and after counsel had presented their arguments as to the legal principles involved, counsel for the Commissioners moved for submission of the cause on their answer. The matter was then taken under advisement by the court.

On 7 May 1973, a decree was entered by the Honorable Newton B. Powell, Presiding Judge, by which it was considered adjudged and decreed that the salary schedule for their respective stenographers theretofore determined by the court was reasonable and was to be put in force, and the Morgan County Commission was taxed with costs, and was ordered to pay the salaries of the stenographers as fixed by the court.

The decree entered by the court is quite lengthy, covering some 31 transcript pages.

The facts are recited in the first three pages and thereafter a number of cases are cited from a substantial number of other jurisdictions supportive of the conclusions reached in the decree that the court had inherent power and statutory power, to fix the salaries of the secretaries, and order the payment of the salaries by the Board of Commissioners.

As stated in State ex rel. Day et al. v. Bowles et al., 217 Ala. 458, 116 So. 662:

"A county is a unit of government invested with important functions of local character, and also in relation to the state, its revenues, the administration of its laws, etc. These functions involve the exercise of legislative, judicial, and executive or administrative powers. These powers are, in the main, conferred and defined by state legislation, and to be exercised by a governing body or bodies of legislative creation."

By Section 12, Title 12, Code of Alabama 1940, whose precursors have been in seven prior codes, the authority of county governing bodies and their powers to act in certain areas, is spelled out in detail. By Section 14, Title 12, Code of Alabama 1940, in addition to the authority granted generally in Section 12, it is specifically provided that the courts of county commissioners, boards of revenue, or other county governing bodies, must adopt a budget system for the conduct of the affairs of the county, and to this end *may* appropriate from the county treasury sufficient funds to pay the actual expenses of the county as shown by the budget so adopted.

■ In the aspect of appropriating money from the county treasury, a county governing body must be deemed as exercising a legislative power.

While many of the cases concerning the point now contain statements relative to the exercise of legislative, executive, or judicial power on the state level, no valid reason appears to deny the application of these same principles on a lower or county level. No distinction is made therefore in our discussion of the powers and limitations of the functions of the three branches of government whether on the state level or county level.

In brief counsel for appellants have raised three material points:

(1) That the court below did not possess inherent power, nor statutory power, under Section 125(28a), Title 13, supra, to order the Commission to put into effect the salary schedule fixed by the judge or judges, since this concerned the appropriation of public funds, a matter within the province of the legislative branch of government rather than the judicial branch;

(2) That the court erred in denying appellants' motion that either or all of the judges recuse themselves from conducting this proceedings since they were interested in the outcome, and,

(3) Counsel for the Association of County Commissions of Alabama, as amicus curiae, have sought to raise the point that the act authorizing secretaries for the judges of the Eighth Judicial Circuit was a local act and void because not advertised.

1. *Inherent Power of a Court to order Appropriation of Monies for Operative Expenses.*

Historically and traditionally the Constitutions of all the states and of the United States have separated the powers of government into three branches, the legislative, the executive, and the judicial. Section 42 of our Constitution of 1901, and its precursors in our previous constitutions, is but a reflection of this settled principle.

Within their respective spheres each branch of government is supreme. State v. Stone, 224 Ala. 234, 139 So. 328. Judicial power and legislative power are coordinate, and neither can encroach upon the other. Ex parte Huguley Water System et al., 282 Ala. 633, 213 So.2d 799. The authority to determine the amount of appropriations necessary for the performance of the essential functions of government is vested fully and exclusively in the legislature. Abramson v. Hard, 229 Ala. 2, 155 So. 590. Section 72, Alabama Constitution of 1901, provides: "No money shall be paid out of the treasury except upon appropriation made by law * * *"

The idea of separation of powers of the three branches of government was well understood by the framers of the United States Constitution, and fully accepted by the framers of the various state Constitutions. As observed by James Madison in *The Federalist* (No. 47), the concept "goes no farther than to prohibit anyone of the entire departments from exercising the powers of another department."

Along with the constitutionally mandated doctrine of separation of powers, two principles probably antedating the written Constitutions produced in this country, have been fully accepted, (1) the independence of the judiciary, and (2) the inherent power of a court to protect its judicial function. These principles are often interlocking, though in a pure sense it would seem that independence of the judiciary relates to freedom of a court from outside influences, including political influence, in the exercise of judicial functions. Life tenure, and to a lesser degree, constitutional provisions that a judge's salary may not be lowered during his term of office, evidence this concept.

The courts have always exercised inherent power to protect its adjudicatory processes, to control such processes, to ward off encroachments upon recognized judicial functions, and in emergencies to order payment of small sums essential to the operation of a court, such payment as for meals and lodging, for a jury, etc. In such instances the exigency originated from a *past* expense necessarily incurred in an emergency, and not for a *future* expense.

It does not seem to have been the intent of the people, as evidence by their Constitutions that the judiciary was to be utterly and completely independent of all political control. It has always been considered, until recently, that it was within the province of the legislature to fix judicial salaries. The provisions in most state Constitutions fixing a judge's tenure for a term of years only and providing for the election of judges, reflects an intention on the part of the people to impose to a degree some limitation on the absolute independence of the judiciary.

In drafting and enacting their Constitutions, the people have given the power to the legislature to tax, and to disburse the proceeds thus raised. This, for the reason that the members of the legislature are closer to the people, and in position to weigh the financial needs of all of the governmental agencies. Their decisions in these matters are political, not judicial. The legislature through committee hearings and close contact with all of the govern-

ment functions and their needs are thus in position to distribute and apportion the state monies from a ·usually inadequate treasury. Clearly, the courts have neither the time nor the equipment for making such decisions.

However, in recent years the courts of several states have, by emphasizing the "Independence of the Judiciary-Inherent Power" theories, reached conclusions that the judiciary, being a coordinate branch of government, has independent fiscal power to maintain itself, and to order the legislative branch to appropriate such monies to the judiciary as the judiciary may find reasonably necessary in the operation of their courts.

Among the many decisions, though not all, holding to this effect, and cited and commented upon in the decree here involved are: Smith v. Miller, 153 Colo. 35, 384 P.2d 738; Noble County Council v. State, 234 Ind. 172, 125 N.E.2d 709; Commissioners Court of Lubbock County v. Martin, 471 S.W.2d 100 (Tex.Civ.App.); Commonwealth ex rel. Carroll v. Tate, 442 Pa. 45, 274 A.2d 193; Judges for the Third Judicial Circuit of the State of Michigan v. County of Wayne, 386 Mich. 1, 190 N.W.2d 228; McAfee v. State ex rel. Stodola, 284 N.E.2d 778 (Ind.); Carlson v. State ex rel. Stodola, 247 Ind. 631, 220 N.E.2d 532; Norman & Warden v. Van Elsberg, 262 Or. 286, 497 P.2d 204; Powers v. Isley, 66 Ariz. 94, 183 P.2d 880; Mann v. County of Maricopa, 104 Ariz. 561, 456 P.2d 931; Bass v. County of Saline, 171 Neb. 538, 106 N.W.2d 860; Board of Commissioners of Vigo County v. Stout, 136 Ind. 53, 35 N.E. 683; In re Salaries for Probation Officers of Bergen County, 58 N.J. 422, 278 A.2d 417; Birdsall v. Prima County, 106 Ariz. 266, 475 P.2d 250; State ex rel. Weinstein v. St. Louis County, 451 S.W.2d 99 (Mo.).

The most far-reaching decision concerning the inherent powers of a court to establish its own fiscal policy is Commonwealth ex rel. Carroll v. Tate, 442 Pa. 45, 274 A.2d 193, cert. den. 402 U.S. 974, 91 S.Ct. 1665, 29 L.Ed.2d 138, decided in 1971. It appears that the Court of Common Pleas had submitted its budget for the fiscal year ending 1 July 1971 to the Finance Director of the City of Philadelphia who pared the proposed budget by some $3,200,000.00. The Court requested an additional $5,200,000.00 from the City Council, and hearings were had on this request. The Council refused the request for additional funds, and approved only the Mayor's recommendation which was based on the original recommendation of the finance director.

The Court thereupon brought mandamus to compel the Mayor and City Council to appropriate the requested additional funds. A Superior Court judge was specially designated by the Supreme Court to hear the matter. After disallowing ten of the twenty-two items included in the budget proposed by the judges, the special judge awarded some $2,500,000.00 in items contained in the budget proposed by the judges and ordered the Mayor and City Council to appropriate this additional amount. The Supreme Court affirmed with some modifications the lower court's mandamus order.

In the proceedings in the lower court, the special judge ruled that the burden was upon the relator court to show the reasonableness of the budget, and further ruled that the City could not present evidence as to the efficient use of funds by the court in its present court budget.

In an excellent comment in 120 Penn.L. R. 1187 (1972), the author points out that while the budget requests of a court might be entirely reasonable for the efficient operation of the court, the budget determined by the legislature may at the same time be reasonable since that body must consider the competing demands for funding made by the many governmental branches, departments, agencies and boards, and the distribution of funds in light of the totality of the demands and the condition of the public treasury.

In the comment in the Pennsylvania Law Review above mentioned, it is noted that in a subsequent case, Glancey v. Casey, 447 Pa. 77, 288 A.2d 812 (1972), the far-reaching doctrine announced in *Tate*, supra, appears to have been modified.

"In *Glancey*, the court appears to have cut back on *Tate's* more far-ranging implications. The *Glancey* court denied the request of the judges of the newly-constituted Philadelphia Municipal Court that mandamus issue to order that their salaries be paid retroactively to their assumption of office. The court maintained that it was powerless to override the legislature's express provision of a somewhat shorter period of retroactivity.

In its opinion, the court all but abandoned inherent-power rhetoric. At the same time, somewhat inconsistently, it held to its position that the legislature had a constitutional duty, even in the absence of the express constitutional provisions theretofore obtaining, to provide 'adequate' compensation to the judiciary. Such compensation was necessary in order to preserve the separation of powers."

But be that as it may, this court appears to have refused to give to the "Independence of the Judiciary-Inherent Power" idea any such scope as evidenced in several of the cases cited and relied on in the decree of the court below.

In Jefferson County v. Capanes, 235 Ala. 449, 179 So. 637, a restaurant owner had sued Jefferson County in assumpsit for the cost of meals furnished to a bailiff attending jurors ordered to be kept together. Judgment in the lower court was for the plaintiff. The judgment was reversed by this court. From the citations of authorities in the brief of the appellee restaurant owner, it is apparent that the argument was made with vigor that such costs were recoverable on the basis of the inherent power of a court to incur all expenses necessary for the holding of court and the discharge of judicial duties. This court disposed of this point in the following language:

"Whatever may be the inherent powers of the courts in other jurisdictions, it is well settled in this state that public officers are entitled to only such fees and costs as are expressly authorized. Mobile County v. Williams, Judge, 180 Ala. 639, 61 So. 963, and cases there cited, as well as section 7255 of the Code of 1923. The feed of the bailiff may not be a fee or cost, strictly speaking, but it is an allowance to him in addition to his regular compensation, and to be entitled to same there must be express statutory authority therefor."

This view is unquestionably sound. If the courts have inherent power to determine their fiscal needs and to order the same paid, then surely this same power should be accorded to the executive branch even though this branch possesses no machinery of its own to order such payments. In their wisdom the people have given to the legislative branch the power and authority to appropriate public monies. Without the centralization of this power in one branch, and if each branch of government be considered fiscally independent, though the judicial and executive branches are without power to tax and raise money, then it can be said with certitude that fiscal chaos would follow as day follows night.

We hold therefore that the court below erred in ordering the governing body of Morgan County to put into effect the salary scales set for secretaries in the budget proposed by the judges.

*Power to fix secretarial salaries arising out of the Act authorizing the Judges of the Eighth Judicial Circuit to employ secretaries, and fix their salaries, with the approval of the County Governing Body.*

Counsel for the appellee further argue that the action of the court below in ordering the county governing body to put into

effect the scale of secretarial salaries as fixed by the court was fully warranted by the provisions of the Act authorizing the employment of secretaries by the Judges of the Eighth Judicial Circuit. This Act has been set out at the beginning of this opinion and will not again be set out. It does authorize the judges to employ secretaries and fix their salaries, but with the approval of the county governing body.

Counsel for the appellee contends that since the Act authorizes the judges to *fix* the salaries of the secretaries, such language clearly evidences a legislative intent to place this function in the hands of the judges, and if the amounts fixed by the judges are reasonable, and there is a presumption in favor of the judges' findings in this regard, then the burden is upon the county governing body to show otherwise, and absent such showing the phrase "with the approval of the county governing body" must be considered as creating a mere ministerial duty on the part of the county governing body to approve the salaries as fixed by the judges.

Admittedly, this argument is supported by a number of the cases cited in the decree.

We do not think, however, that the conclusion is in accord with the decisions of this court.

In State ex rel. Daly v. Henderson, Governor, 199 Ala. 428, 74 So. 951, an Act authorized the Attorney General to incur investigative expenses, such expenses to be paid upon certified account of the Attorney General, to be approved by the Governor. The Governor refused to approve an account for such expenses, and a petition for mandamus to compel such payment was filed. Demurrer was sustained to the petition. On appeal, this court affirmed. The court stated that:

"The only question we need to consider at this time is whether the Governor has discretion to approve or disapprove accounts of this character, or whether

the approval required of him by the statute is merely ministerial."

As to the significance of the phrase "to be approved by the Governor" this court wrote:

"And so, too, the Legislature might have required the Governor to countersign the Attorney General's certificate as a matter of mere form, signifying nothing in fact, but until that meaning shall have the support of some argument drawn from extrinsic circumstances or conditions in view of which the act may have been passed, the court deems it best to assign to the phrase 'approved by the Governor' that meaning which it carries to the common understanding, viz., that it was intended, as a condition precedent to payment, to evoke the Governor's official sanction of the expenditure, his commendation and judgment that it was for the public good. The court does not see its way clear to a definition of the phrase which would exclude the right of the Governor to exercise judgment and discretion in approving or disapproving the expenditures submitted to him."

A closer case analogically is Gardner v. Stevens, 269 Ala. 213, 111 So.2d 904. There a statute provided that whenever it was proposed to locate a cemetery located in the jurisdiction of a county, application would be made to a county governing body who in turn would refer the application to the county board of health for investigation from a sanitary standpoint. Upon completion of such investigation, the county board of health would report its findings to the county governing body and "either approve or disapprove the application." Thereafter the county governing body "shall either grant or deny the application, giving due weight in reaching either conclusion to the views expressed by the county board of health."

The county governing body of Mobile County denied an application to locate a cemetery in Mobile County after the county board of health had approved the loca-

tion. Mandamus was sought to compel approval by the county governing body. The petition for the writ was denied. The decree was affirmed.

On appeal the appellant contended that the statute made approval by the county governing body merely a ministerial act after an application had been approved by the county board of health. In disposing of this contention, this court wrote:

"* * * We are unable to agree with this construction. If such were the case, there would be no necessity for filing the application with any authority other than the county board of health, and the county board of health would not be limited to an 'investigation from a sanitary standpoint.' The statute also provides that when the report is received from the board of health, the governing body 'shall either grant or deny the application, giving due weight in reaching either conclusion to the views expressed by the county board of health.' This seems to indicate clearly that the Legislature intended to vest discretion in the governing body to deny the application even if it were approved from a sanitary standpoint."

This same rule has been applied with respect to approving security bonds and it is held to be a matter of discretion on the part of the approving authorities. Baker v. Denniston–Boykin Co., 245 Ala. 407, 17 So.2d 148; Ex parte Harris, 52 Ala. 87.

Many of the courts of our sister states have construed the words "subject to the approval" or similar phrases, as has this court. See Avery v. Norfolk County, 279 Mass., 598, 181 N.E. 707; McCarten v. Sanderson, 111 Mont. 407, 109 P.2d 1108; Brown v. City of Newburyport, 209 Mass. 259, 95 N.E. 504; Harris v. Board of Education, 216 N.C. 147, 4 S.E.2d 328; Snider v. State, 206 Ind. 474, 190 N.E. 178; Fuller v. Board of Univ., 21 N.D. 212, 129 N.W. 1029; Baynes v. Bank of Caruthersville (Mo.App.), 118 S.W.2d 1051.

Courts cannot ignore plain meaning of a statute, Ott v. Moody, 283 Ala. 288, 216 So.2d 177, and absent any indication to the contrary, words in a statute will be given meaning generally accepted in popular, everyday usage. State v. International Paper Co., 276 Ala. 448, 163 So.2d 607; State v. Lamson & Sessions Co., 269 Ala. 610, 114 So.2d 893.

In Webster's New International Dictionary, Third Edition, the word "approval" is defined to mean "1. The act of approving, approbation, sanction. 2. Certification as to the acceptability (as of a request for capital expenditures)."

The phrase "subject to the approval of" necessarily includes the right of disapproval. We do not see how the legislature could have more clearly expressed an intention to make approval by the county governing body a prerequisite to establishing the salaries of the secretaries as fixed by the judges. There is nothing in the entire context of the statute imposing any limitation on the power of the county governing body to approve, or disapprove the salaries.

We would, therefore, be unjustified in limiting the plain intent of the statute. While those courts which take the view that the words "subject to the approval of" are limited by the power given to another to "fix" the salaries in the same statute, we consider it more persuasive to conclude that the true intent of the legislature was to place in the county governing body, which body appropriates the public monies, the final say-so in the disposition of such funds, and thus centralize in the legislative body a function lawfully and traditionally delegated to that body by the legislature.

### Denial of Motion of Recusal

Section 6, Title 13, Code of Alabama 1940, among other things forbids any judge of any court to sit in any cause or proceeding in which he is interested without the consent of the parties entered of record, or put in writing.

■ The statutory causes of disqualification of a judge are not exclusive of the common law principles on the same subject, one of which is that no judge ought to act where, from interest or any other cause, he is supposed to be partial to one of the suitors. Smith v. Pitts, 139 Ala. 152, 36 So. 20; Bryce v. Burke, Probate Judge, 172 Ala. 219, 55 So. 635. Nor should a judge act if he has any interest, the probable and natural tendency of which is to create a bias in the mind of the judge for or against a party to the suit. Woodmen of the World v. Alford, 206 Ala. 18, 89 So. 528.

Here the record shows that these proceedings were instituted by the circuit judges. After they had investigated the salaries paid secretaries in surrounding circuits and in law offices, and industries, they sent their proposed salary schedule for secretarial salaries to the County Commission. By letter, the Chairman of the County Commission, apparently acting for the Commission, informed the judges that the salary schedule would continue as that recommended by the report of the representative of the State Personnel Board. The judges then issued a show cause order to the Commission, signed by all three judges. The motion that each of the three judges recuse himself followed. This motion being denied, the Commission filed its answer hereinabove mentioned. The decree later entered was signed only by the presiding judge.

In other words, we have here a show cause order issued by the three judges, based upon evidence they themselves had gathered, and a decree by one of the judges, based upon this same evidence.

Under the circumstances it appears that the only inference that could be drawn is that the judges, individually and collectively, could hardly be considered as impartial arbiters, nor lacking in any interest the natural tendency of which would be to create bias in favor of the correctness of their recommendations as to the salaries of their secretaries.

■ We hold, therefore, that the motion that the judges recuse themselves should have been granted and its refusal was error.

In this connection, we note that of the cases cited in the decree here appealed from, Smith v. Miller (Colo.); Noble County Council v. State (Ind.); Commissioners Court of Lubbock County (Tex. Civ.App.); Commonwealth ex rel. Carroll v. Tate (Pa.); Judges etc. v. State of Michigan (Mich.); McAfee v. State ex rel. Stodola (Ind.), all cited supra, were heard before specially appointed judges.

Birdsall v. Pima County (Ariz.) and State ex rel. Weinstein v. St. Louis County (Mo.), all cited supra, were originally brought in appellate courts.

In six of the cases cited in the decree either special judges were not appointed, or the opinion does not indicate either way.

*The question of whether the Act providing for secretaries for the Judges of the Eighth Judicial Circuit is a local Act and void because not advertised.*

This point was raised in the amicus curiae brief filed by counsel for the Association of County Commissioners of Alabama.

■ We pretermit consideration of this point for the following reason:

The question was not raised in the proceedings below, nor was it raised in the brief filed by the appellants.

■ An amicus curiae is limited to the issues made by the parties to a suit, and issues not made in proceedings below, nor raised in brief of appellant, cannot be injected into a review by any action on the part of the amicus curiae. Alabama-Tennessee Natural Gas Co. v. City of Huntsville, 275 Ala. 184, 153 So.2d 619; Anderson v. Smith, 274 Ala. 302, 148 So.2d 243.

Reversed and rendered.

MERRILL, COLEMAN, MADDOX and McCALL, JJ., concur.

JONES, J., concurs specially.

HEFLIN, C. J., and FAULKNER, J., dissent.

BLOODWORTH, J., recuses himself.

JONES, Justice (concurring specially).

My concurrence with the majority opinion is limited to the single issue of the denial of the motion of recusal. Paramount to any system of justice is the total impartiality of the court which sits in judgment of any controversy. The appearance of fairness is virtually as important as is fairness itself. One of the essential ingredients of an effective judiciary is the high level of respect accorded it by the citizenry. Except for the impartiality of those who occupy the role of judge, both in act and appearance, the level of respect necessary to a strong and effective judiciary will fail. It is the essence of the system that any position of interest or bias is sufficient cause for disqualification of a judge, and the right to raise and insist upon the causes of disqualification must be zealously guarded. The participation of the appellees in the attempted selection of the secretaries, the fixing of the salaries, and their natural interests in the outcome of the litigation clearly disqualified the judges in the instant case from proceeding to an adjudication of the matter. The motion of recusal should have been granted.

I feel strongly that the remaining portion of the majority opinion is an unfortunate step backward in judicial administration and a crippling blow to the separate and equal concept of our three branches of government. I am in complete agreement with the views expressed in the dissenting opinion of Mr. Chief Justice Heflin.

HEFLIN, Chief Justice (dissenting):

In 1959 the legislature passed the act which appears in Title 13, Section 125 (28a) of the Code. The then two judges of the circuit determined that one secretary could adequately meet their needs. The salary of this employee was determined by cooperative discussions between the judges and the County Commission. As the workload of the court increased, a second secretary was employed and her salary was fixed under the same cooperative arrangement between the judges and the County Commission. Cooperation prevailed for over ten years.

A third judge was added to the circuit by the legislature in 1971. A third secretary was employed.

In the meantime, a merit system with job descriptions for county employees developed. The County Commission began to treat the judges' secretaries as employees of the County Commission and took the position that the judges shouldn't decide on the duties, qualifications and salaries of the secretaries, but this should be done by others. The County Commission had representatives from the state personnel system to make a survey of county employees and related salaries. The judges afforded the surveyors with job descriptions and outlines of the duties and responsibilities of their employees. These were ignored in the survey.

When budget making time came about following the survey, the County Commission advised the Presiding Judge that the proposed salary schedule submitted by the court would not be accepted and that the court's secretaries would be paid as Clerk-Typists at a much lower rate than proposed and at the same rate as certain other county employees. The Chairman of the County Commission, in January of 1973, took the position that he had the authority to fix their compensation and that the judges must abide by his decision. It is clear that the judges desired to continue

the cooperative approach towards the fixing of the salaries but the County Commission assumed an arbitrary position. Thus battle lines were drawn.

I disagree with the majority opinion and, therefore, respectfully dissent for many reasons hereinafter set out.

## CONSTRUCTION OF STATUTE

The majority opinion recites, in substance, that the appellees (Circuit Judges) contend that the language of Section 125(28a), Title 13, Code, authorizes the judges to *fix* the salary of the secretaries, such language clearly evidencing a legislative intent to place this function in the judges and that the burden is upon the County Commission to show that "the amount" is unreasonable in the event that they do not grant their approval to the amount. Then the majority opinion states:

> "Admittedly, this argument is supported by a number of the cases cited in the decree.

> "We do not think, however, that the conclusion is in accordance with the decisions of this court."

To support this position the majority rely on two Alabama cases, State ex rel. Daly v. Henderson, Governor, 199 Ala. 428, 74 So. 951 (1917), and Gardner v. Stevens, 269 Ala. 213, 111 So.2d 904 (1959). In my opinion, a careful study of these cases reveals that these cases do not support the position of the majority opinion.

In *Henderson,* the petitioner sought a Writ of Mandamus to compel the Governor to approve a certificate detailing expenses incurred by petitioner while doing investigative work for the Attorney General pursuant to an act giving the Attorney General authority to incur such expenses. The act in question stated that such expenses are to be paid on a certificate of the Attorney General of the account, properly itemized and sworn to, with such certificate to be approved by the Governor.

The holding of *Henderson* was based on the following:

1. The case was brought by petition for mandamus. The lower court sustained demurrers to the petition. The relator appealed. In the event there was discretion on the part of Governor Henderson, the demurrer was properly sustained. This is because of the long standing and well-settled rule that, whereas the courts by mandamus may compel an executive officer to perform a mere ministerial act, Tennessee & C. R. Co. v. Moore, 36 Ala. 371 (1860), the exercise of a discretionary power by public officers cannot be controlled by mandamus. Yielding v. Bland, 184 Ala. 62, 63 So. 961 (1913). See also State v. Jelks, 138 Ala. 115, 35 So. 60 (1903) (mandamus maintainable against governor to enforce performance of purely ministerial acts); Henry v. State, 200 Ala. 475, 76 So. 417 (1917).

2. The court, in effect, concluded that the Governor as the chief executive of the state was to exercise judgment and discretion in approving or disapproving the expenditures submitted to him. That determination was based upon the following:

(a) To hold otherwise would be to give to the Attorney General a power in excess of that exercised by the chief executive of the state;

(b) To hold otherwise would make the chief executive, *upon whom the constitution with emphasis lays the burden of seeing that the laws are faithfully executed,* a marionette to be moved by a string in the hand of another.

3. A determination of legislative intent of the meaning of the words "approved by the Governor" was based on the particular language of the act, the relationship between the Attorney General and the Governor, and the legislative history of the act. However, the opinion says, in substance, *that if a different meaning had support of some argument other than the*

*peculiar circumstances of this case or a different legislative history, then the court would support a different interpretation.*

4. The court looked to the legislative history and found that peculiar circumstances of amendments to meet the Governor's objections following his earlier veto supported the Governor's position pertaining to what his approval meant.

In the instant case the rationale of *Henderson* supports the circuit judges' position. The circuit judges are constitutional officers and the county commission is a statutorily created body. The majority opinion in effect makes the constitutional officers' task under the act surplusage, · or at the most "ministerial" or "suggestive", and turns the secondary task of a statutory agency into a primary and conclusive function. In the balance of power between a constitutional officer and a statutory county commission the majority's position is hardly logical and doesn't follow the deference rationale of *Henderson.* Cf. Perkins v. Corbin, 45 Ala. 103 (1871) (circuit courts "same grade in sovereign power" as legislature itself).

Regardless, the holding in *Henderson* is sui generis because of mandamus law, the relationship of the Governor to the Attorney General, and the legislative history of the act. It doesn't stand as a binding precedent for the construction of the word "approval" under different statutory language and different facts.

In Gardner v. Stevens, supra, the petitioner sought a mandamus to compel the Board of Revenue and Road Commissioners of Mobile County to issue a license to establish a cemetery, since, the petitioner alleged, the approval of the county governing body was a mere ministerial function after the County Board of Health approved the application. The statute in *Gardner* contained the following provision:

"Having received the report from the county board of health, the judge of probate and commissioners, . . . shall either grant or deny the application, giving due weight in reaching either conclusion to the views expressed by the county board of health." Title 22, Section 88, Alabama Code of 1940, as amended (Recompiled 1958).

This court held that the phrase "shall either grant or deny the application" clearly indicated a legislative intent to vest discretion in the governing body even if the application has to be submitted for approval to the board of health from a sanitary standpoint.

I do not interpret *Gardner* to support the position taken in the majority opinion. Again, the interpretation given to the language "either approve or disapprove the application" is sui generis. The holding in *Gardner* is to the effect that under the language of the statute involved the legislature intended that the final determination would be made by the Board of Revenue and Road Commissioners of Mobile County. In the instant case the language of the act places the matter of approval with the County Commission only on the matter concerning the amount and does not use the word "disapprove" at all. The remaining language of the act gives the primary authority to the judges—"to employ"—to determine the clerical or stenographic assistance as may be necessary to carry out the duties of the office and—to fix the salaries. The act further makes payment by the county mandatory. The language of the act in the instant case supports the interpretation that the final determination concerning stenographic assistance is placed on the judges. The language of the act in the instant case is almost as strong in placing the primary duty on the judges as the language of the act was in *Gardner* in saying that the Board of Revenue and Road Commissioners of Mobile County had the primary duty of locating cemeteries.

It is interesting to note that the county commissioners begin their argument on the proper construction of the statute by refer-

ring to a corollary of the theory of separation of powers—that of the system of checks and balances. They cite, for example, that major appointments by the President of the United States are made subject to the advice and consent of the Senate, and that bills passed by the Legislature of Alabama must be approved by the Governor. See U.S.Const. Art. II, Sec. 2; Ala.Const. of 1901, Sec. 125. These are but two of the many checks and balances which uphold our constitutional system. The analogy the county commissioners would have this court draw is that just as the actions of one branch are subject to a check of another, so the power of the judges to fix salaries is subject to a check by the County Commission. With the analogy I would agree. But it must be borne in mind that a check is only a check —it is not the power to do the very act restrained. Thus the President still *appoints*, and the legislature still *acts*, both subject to checks. I think that this is what was intended when the legislature gave the judges the power to fix the salary of these employees. The judges fix the salaries subject to a check by the commission.

The majority cites *Henderson* and *Gardner* in which the term "approval" has been held to mean that the approving authority had the final word on the matter in question. The cases involved a dispute between elements of the same branch of government. Clearly when an act of an official in the executive branch is made subject to the approval of the chief executive, then the chief executive's decision should be binding.

The majority opinion has applied the same rationale in deciding the case at hand. It permits the commission and not the judges to fix the salaries. What the commission and a majority of this court have failed to consider is that an independent constitutional branch of government (the judiciary) is involved with a statutory agent of the legislature and that one has a statutory power subject to a statutory check. The question that naturally follows is how the commission is to exercise its statutory check.

The standard to be applied, of course, is one of reasonableness. The commission must examine the salary set by the court in light of the totality of the circumstances, including the financial condition of the county, the other preferred claims of the county, and the need of the judicial system for competent personnel. If the salary fixed is unreasonable under all these circumstances, then it is the duty of the commission to disapprove it. But if the salary as set by the judges is reasonable, then the commissioners are just as duty bound to approve it. I realize that in fixing salaries there may be a range of reasonableness. For example, the salary fixed by the judges and the salary urged by the commission might both be reasonable. But since the commission is only a check on the power of the judges, it is encumbent upon the commission either to approve the salary so fixed, or to demonstrate its unreasonableness. Thus, in a proceeding to determine what salary shall be approved, the burden is on the commission to prove that the salary set by the judges is unreasonable.

The following cases from other states support the view that "fix . . . subject to approval" vests the power to set the salary in the court subject to rejection on the part of the commission only if the salary fixed is unreasonable. Norman v. Van Elsberg, 262 Or. 286, 497 P.2d 204 (1972); Powers v. Isley, 66 Ariz. 94, 183 P.2d 880 (1947); Smith v. Miller, 153 Colo. 35, 384 P.2d 738 (1963); Birdsall v. Pima County, 106 Ariz. 266, 475 P.2d 250 (1970); Commissioners Court of Lubbock County v. Martin, 471 S.W.2d 100 (Tex. Civ.App.1971). I agree with such a construction.

### DEFENSIVE PLEADING BUT NO PROOF

It is interesting to note that the County Commissioners filed an answer but de-

clined to offer any evidence or testimony. Thus, this appears to be a case in which there was defensive pleading but no proof to support the pleading. A certified copy of the order or resolution of the County Commission disapproving the amounts of the salaries was not introduced.

In response to the court's "order to show cause" the county commission filed an answer which contained the following pertinent part:

"Considering the total welfare of the County, its income, its obligations and required expenditures, the salary schedule of the stenographers and clerical employees of the other officers of the County required to be paid by the Commission and that of its own stenographers and clerical employees, it declined to approve the salary schedule submitted to it for approval by the Judges of the court."

The answer at no place denied the allegations of the "order to show cause." There was no testimony concerning the total welfare of the County, no testimony concerning its income, no testimony concerning its obligations, no testimony concerning its required expenditures or the salary schedule of stenographers and other employees, and no testimony in support of any part of its answer.

In short, not only was there a total absence of proof on the part of the commission, there was not even an effort made to prove that its action was reasonable. In effect, there was a defensive pleading but no defensive proof.

A show cause order like the one issued in this case has been described as "an order requiring a party to appear and show cause why a certain thing should not be done or permitted. *It requires the party to meet the prima facie case made by the applicant's verified complaint or affidavit.* 60 C.J.S. Motions and Orders §§ 20, 37(e); 37 Am.Jur., Motions, Rules and Orders, Sec. 38." Boyd v. Louisville & Jefferson County Planning & Zoning Commis-

sion, 313 Ky. 196, 230 S.W.2d 444 (1950) (Emphasis added). In other words, the burden of proof is on the party called to show cause. Here not ony was the burden not met, but no attempt was made to meet it. This court has held that when the burden of proof of a particular fact has devolved upon a party, and he fails to give evidence of such fact, its nonexistence will be assumed. McWilliams v. Phillips, 71 Ala. 80 (1881); American National Bank & Trust Co. v. Long, 281 Ala. 654, 207 So.2d 129 (1968). This standing alone is sufficient reason to affirm the action of the court below.

## VALIDITY OF COMMISSION'S POSITION

Assuming the commission did properly meet and consider the factors mentioned in its answer, the answer recites factors which should not have been considered by the commission in making its decision, as will be explained.

The law in this state with regard to the power of counties appears to be well settled. Counties are said to be political subdivisions created by sovereign power in accordance with sovereign will and exercising only such power as conferred on them by law. Alexander v. State, 274 Ala. 441, 150 So.2d 204 (1963). Counties have no inherent power and no duty except by statute. Laney v. Jefferson County, 249 Ala. 612, 32 So.2d 542 (1947). Even the authority to tax is not inherent in counties— it is derived from the legislature. Newton v. City of Tuscaloosa, 251 Ala. 209, 36 So. 2d 487 (1948).

In the instant case the Legislature of Alabama determined that the circuit judges were entitled to clerical or stenographic assistance and enacted a statute to that end. The legislature further provided that the judges would determine what clerical or stenographic services they needed. Further, the legislature told the county commission that the county would pay the salaries for such clerks or stenographers.

The legislature, in the absence of a constitutional limitation, has plenary power to deal with counties, Y. W. C. A. v. Gunter, 230 Ala. 521, 162 So. 120 (1935). Matters of policy as to counties and county funds and how they shall be handled and preserved are matters of legislative policy. Covington County v. O'Neal, 239 Ala. 322, 195 So. 234 (1940). The state, through the legislature, may even appropriate county funds for public purposes. Jefferson County v. City of Birmingham, 251 Ala. 634, 38 So.2d 844 (1949).

Title 12, Section 121, Alabama Code of 1940, as amended, (Recompiled 1958) establishes that certain claims are preferred claims against the county and shall be given priority in payment over non-preferred claims. In Brown v. Gay-Padgett Hdw. Co., 188 Ala. 423, 66 So. 161 (1914), the court, in dealing with this section stated:

"Legitimate county debts or obligations are of two classes: (1) Those which are prescribed and imposed by law, and are purely involuntary as to the county; (2) those which are merely authorized by law, and are assumed by the county with some measure of discretion, at least as to time or amount."

Clearly the obligation created by the statute in the case at hand did not create a mere authorization for the county to spend money—the statute reads "shall be paid . . . out of the county treasury . . . .'' Thus a claim against the county of the first class was created by the statute at hand—a claim which is purely involuntary on the part of the county. Note also that under Section 121(2) expenses of the courts are listed as preferred claims. Thus there is little doubt that the obligation to pay each judicial secretary's salary enjoys a preferred status.

In its answer in the instant case, the County Commission admits that it took into account voluntary, non-preferred expenditures in determining that it would not approve the salary schedule fixed by the court. Certainly logic requires that pre-ferred claims should be paid in full before voluntary or non-preferred claims are paid. Thus it would seem that the County Commission, in considering these preferred claims in the same class as voluntary claims, acted in an unreasonable, if not illegal manner.

## MOTION TO RECUSE

The appellants-commissioners argue, and the majority holds, that the court below committed reversible error by overruling the commissioners' motion to recuse. In my view, however, the court below did not err by overruling the motion to recuse.

The appellants argue that the judges of the Circuit Court should have recused themselves because of a personal interest in the matter, and, though urged for the first time now on appeal, because the judges were "witnesses" in the case. This contention is faulty for several reasons.

First, the judges were not acting in their judicial roles in this case, but were acting as an element of the judicial branch of government. The statute under which the stenographers are to be hired states that the salaries "shall be fixed by such judge." The judges' only interest in the case was in fulfilling their statutory duty of fixing the salaries of the stenographers. Thus, their interest can hardly be described as "personal," rather they were acting as constitutional officers of the judicial branch attempting to fulfill a duty created by a statute.

The procedure employed is analogous to that of a contempt proceeding. In such a proceeding it is normal for the judge whose order was violated or who was treated with disrespect to try the case. See, e. g., Ex parte Wetzel, 243 Ala. 130, 8 So.2d 824 (1942). Just as a judge in such a case has no personal interest in punishing a contempt of the court, so too, the judges in the case at hand have no personal interest in seeing that the statute is complied with.

Finally, it goes almost without saying that additional grounds for recusal cannot be raised for the first time on appeal. See, e. g., Cox v. Howard Hall Co., 289 Ala. 35, 265 So.2d 580 (1972); Thomas v. Brook, 274 Ala. 462, 149 So.2d 809 (1963).

Furthermore, the record does not indicate that the judges, or anyone else for that matter, were ever called as witnesses. The County Commission, for reasons of its own, declined to take advantage of the opportunity presented by the court to show cause why the salary fixed by the court should not be implemented, but rather, the commission merely filed an answer which stated, in effect, that the commission declined to approve the salary schedule.

## THE DOCTRINE OF INHERENT POWER

While I believe that the action of the Court below can be upheld merely on the basis of statutory construction or because of the failure of the County Commission properly to respond to the show cause order, the majority does not share this view and feels constrained to treat the additional issue of the inherent powers of the courts. Thus, although I do not think it necessary to reach this issue, I feel I must respond by stating my views on the inherent powers of the courts of this state.

Despite the apparent assertion by Chief Justice Anderson in Jefferson County v. Capanes, 235 Ala. 449, 179 So. 637 (1938) to the effect that the inherent power doctrine is not recognized by the courts of this state, the issue of the courts' inherent power to do things not of a traditional judicial nature has never been squarely faced by this court. Indeed, although one of the parties attempted to assert the principle in *Capanes,* the stipulated facts upon which the case was tried and decided do not reveal any basis for such an argument. The sole question presented was whether a bailiff, without express statutory authority, could *on his own* incur expenses for meals for himself while attending a jury. No

judge made any order authorizing the charging of such meals to the county at any time. The suit was in assumpsit brought by the restaurant owner against the county. In *Capanes,* the holding was that the only costs or fees public officers were authorized to receive were those expressly authorized by law and this primarily because "[t]he law of fees and costs must be held to be penal." Title 11, Section 1, Alabama Code of 1940, as amended (Recompiled 1958); Mobile County v. Williams, 180 Ala. 639, 61 So. 963 (1913). The only authority cited by the court supporting this holding, the *Williams* case, dealt with the collection or payment of fees and not with the inherent power of a court to do anything. The judgment reversed in *Capanes* was one by the lower court exercising its ordinary judicial power in an action in assumpsit and not of a court in the exercise of its inherent power. Thus the statement in *Capanes* is dicta at best, and is not even weighty dicta as evidenced by the fact that the reference to inherent power is more of *an aside* rather than a direct assertion, and was not supported by *any* authority.

*Capanes* is the only case cited by the majority opinion in which this court even gave the appearance of rejecting the inherent powers doctrine. In almost every other case where the inherent power of the court has been asserted, such power has been upheld. See Larkin v. Mason, 71 Ala. 227 (1881) (inherent power to prevent abuse of process); Ex parte State, 150 Ala. 489, 43 So. 490 (1907) (power to order stay of execution of convicted murderer); Ex parte Mayor and Aldermen of Birmingham, 134 Ala. 609, 33 So. 13 (1902) (courts have inherent power, irrespective of statute, to make rules for regulation and transaction of business; may punish for contempt); Brown v. McKnight, 216 Ala. 660, 114 So. 40 (1927) (inherent power to make reasonable rules for conduct of business); Ex parte Wetzel, 243 Ala. 130, 8 So.2d 824 (1942) (inherent power to punish contempt); Ex parte

Huguley Water System, 282 Ala. 633, 213 So.2d 799 (1968) (inherent power to strike parties, third party practice statute notwithstanding); Broadway v. State, 257 Ala. 414, 60 So.2d 701 (1952) (legislature can not take power from courts it did not give—i. e. decision granting new trial judicial and not ministerial). It is true that these cases generally deal with the inherent power to do things of a judicial nature, but even the majority opinion recognizes the existence of inherent power as demonstrated by the following assertion, "The courts have always exercised inherent power to protect its adjudicatory processes, to control such processes, to ward off encroachments upon recognized judicial functions, and in emergencies to order payment of small sums essential to the operation of a court . . . ." *Once the power is recognized, the issue is no longer its existence, but its bounds.* The fact that no case has arisen in which it became necessary for the courts to exercise their dormant power to accomplish things not of a strictly judicial nature is no indication that the power is limited to those acts which are strictly judicial.

The concept of inherent power is not some device created by a power-hungry judiciary, but is a doctrine that is concomitant to the very structure of our tripartite form of government. If the judicial system is to be a truly co-equal and independent branch answerable only to the sovereign—the people—then it must have the power to maintain itself under exigent circumstances. Certainly in the usual situation it is not necessary for the courts to exercise any extraordinary power since the other great branches of government are also charged with the constitutional duty to provide for an effective judiciary. It is only when the other branches are remiss in their constitutional duties that the court must act to preserve the efficient administration of justice.

Nor is the concept of inherent power something unique or novel. Almost every court in this country which has considered the issue has upheld the power of the judicial branch to provide for itself when the real needs of justice have been slighted by a legislative branch pre-occupied with other, more visible, problems. O'Coins, Inc. v. Treasurer of County of Worcester, 287 N.E.2d 608 (Mass.1972) (court ordered purchase of tape recorder without prior appropriation); Smith v. Miller, 153 Colo. 35, 384 P.2d 738 (1963) (court has power to fix employees' salaries); Noble County Council v. State, 234 Ind. 172, 125 N.E. 2d 709 (1955) (inherent power to appoint and fix salary of probation officer); Commissioners Court of Lubbock County v. Martin, 471 S.W.2d 100 (Tex.Civ.App. 1971) (power to appoint and fix salaries of probation officers); Commonwealth ex rel. Carroll v. Tate, 442 Pa. 45, 274 A.2d 193 (1971) (power to fix court's operating budget); Judges for the Third Judicial Circuit of the State of Michigan v. County of Wayne, 386 Mich. 1, 190 N.W.2d 228 (1969) (power to hire and fix salary of law clerks and judicial assistants); McAfee v. State ex rel. Stodola, 284 N.E.2d 778 (Ind.1972) (power to set employees' salaries); Carlson v. State ex rel. Stodola, 247 Ind. 631, 220 N.E.2d 532 (city court has power to fix budget; city commission can not interfere with court's functioning by refusing budget request); Norman v. Van Elsberg, 262 Or. 286, 497 P.2d 204 (1972) (power to fix salaries of juvenile counselor); Powers v. Isley, 66 Ariz. 94, 183 P.2d 880 (1947) (power to fix salary of court reporter); Mann v. County of Maricopa, 104 Ariz. 561, 456 P.2d 931 (1969) (power to continue employee over age 70 for one additional year); Board of Commissioners of Vigo County v. Stout, 136 Ind. 53, 35 N.E. 683 (1893) (power to order county commission to operate elevator in courthouse); In re Salaries for Probation Officers of Bergen County, 58 N.J. 422, 278 A.2d 417 (1971) (salaries for probation officers); Birdsall v. Pima County, 106 Ariz. 266, 475 P.2d 250 (1970) (power to fix salaries of juvenile court employees); State ex rel. Weinstein v. St.

Louis County, 451 S.W.2d 99 (Mo.1970) (power to select and appoint juvenile officers); State ex rel. Kitzmeyer v. Davis, 26 Nev. 373, 68 P. 689 (1902) (power to order purchase of courtroom equipment); State ex rel. Schneider v. Cunningham, 39 Mont. 165, 101 P. 962 (1909) (power, absent statute, to employ stenographer, fix salary, and order warrant for payment).

Smith v. Miller, supra, is particularly apt, since it is practically on all fours with the instant case. One of the most recent cases to decide the inherent powers issue, the O'Coins case decided by the Supreme Judicial Court of Massachusetts, is worthy of special attention. There a trial court had purchased a tape recorder, and the County Commission refused to pay for it. There the court stated:

"Even apart from statutory provisions, we are of opinion that a judge may bind a county contractually for expenses reasonably necessary for the operation of his court, and that he may issue an ex parte order for the payment of any obligation so incurred.

"Under our Constitution, the courts of the Commonwealth constitute a separate and independent department of government entrusted with the exclusive power of interpreting the laws. In erecting this tripartite form of government, our first citizens meant to secure to themselves, and their successors, every natural right of free men. The intimate relationship between these rights and the judicial power is made clear in art. 29 of the Declaration of Rights: 'It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice.' Also it is provided in art. 11: 'Every subject of the commonwealth . . . ought to obtain right and justice freely, and without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws.'

"From these provisions, it necessarily follows that 'courts of general jurisdiction . . . have the inherent power to do whatever may be done under the general principles of jurisprudence to insure to the citizen a fair trial, whenever his life, liberty, property or character is at stake.' Simply stated, implicit in the constitutional grant of judicial power is 'authority *necessary* to the exercise of . . . [that] power' (emphasis supplied). Such authority is not limited to adjudication, but includes certain ancillary functions, such as rule-making and judicial administration, which are essential if the courts are to carry out their constitutional mandate. . . .

"It is axiomatic that, as an independent department of government, the judiciary must have adequate and sufficient resources to ensure the proper operation of the courts. It would be illogical to interpret the Constitution as creating a judicial department with awesome powers over the life, liberty, and property of every citizen while, at the same time, denying to the judges authority to determine the basic needs of their courts as to equipment, facilities and supporting personnel. Such authority must be vested in the judiciary if the courts are to provide justice, and the people are to be secure in their rights, under the Constitution.

"We hold, therefore, that among the inherent powers possessed by every judge is the power to protect this court from impairment resulting from inadequate facilities or lack of supplies or supporting personnel. To correct such an impairment, a judge may, even in the absence of a clearly applicable statute, obtain the required goods or services by appropriate means, including arranging himself for their purchase and ordering the responsible executive official to make payment.

"It is not essential that there have been a prior appropriation to cover the expenditure. Where an obligation is thus legally incurred, it is the duty of the State, or one of its political subdivisions, to make payment. The view that there must be checks and balances between the departments of government is not contrary. It was certainly never intended that any one department, through the exercise of its acknowledged powers, should be able to prevent another department from fulfilling its responsibilities to the people under the Constitution.

"The principles expressed today are recognized not only in Massachusetts but throughout the nation." (Citations omitted)

These cases are convincing evidence that this doctrine is a fundamental element of the jurisprudence of this nation. It is strange indeed that in the face of this overwhelming body of authority, the majority feels bound by an almost side remark, in one case in which the issue was not actually before the court.

Thus, as already mentioned, once the inherent power of the judiciary to preserve itself is recognized, the issue then becomes the bounds of such power. I concur in the view of the majority that the people of this state have not manifested an intent to have the judiciary free of all control. Alabama judges, like members of the other two branches, must place their records before the people every six years (a term not disproportionately greater than the term of those "close to the people"). Furthermore, the people have retained the power to amend the constitution—the document from which all the power of the courts is derived.

A final restraint, clearly articulated in the new judicial article to our state constitution, is that the courts are bound by a standard of reasonableness and responsibility, a standard the courts are asked to apply almost daily in one context or another.

The court in the *O'Coins* case provided a lucid summary of this last consideration:

"We are mindful that exercise of this inherent power is a duty which must be borne responsibility. A spirit of mutual cooperation among the legislative, executive, and judicial departments is unquestionably the people's best guaranty of constitutional government. It is therefore incumbent upon members of the judicial department to proceed cautiously, and with due consideration for the prerogatives of the executive department and the Legislature, whenever exercise of an inherent judicial power would bring us near the sphere of another department."

The only other authority besides *Capanes* that the majority relies upon is a student comment from the Pennsylvania Law Review asserting that at least one court has backed off from its firm stand on inherent power. The view of that author is that the Supreme Court of Pennsylvania retreated from the position it took in Commonwealth ex rel. Carroll v. Tate, 442 Pa. 45, 274 A.2d 193, cert. den. 402 U.S. 974, 91 S.Ct. 1665, 29 L.Ed.2d 138 (1971), discussed at length in the majority opinion, in a later opinion by that court, Glancey v. Casey, 447 Pa. 77, 288 A.2d 812 (1972). This assessment of Glancey does not appear to be sound.

Two issues were presented in *Glancey*: (1) Whether the Pennsylvania legislature had the exclusive constitutional authority to fix judicial compensation, and (2) whether a certain salary-fixing statute was unconstitutional.

There was really no issue of inherent power of the court raised by *Glancey* and the Supreme Court distinguished *Glancey* from *Tate* in this manner:

"Appellants rely also upon Com. ex rel. Carroll v. Tate, 442 Pa. 45, 51–57, 274 A.2d 193, 196–200 (1971), cert. denied, 402 U.S. 974, 91 S.Ct. 1665, 29 L. Ed.2d 138 (1971). Carroll [Tate] is also

presently inapposite in that it involved the appropriation by a legislative body of additional funds deemed necessary for the effective operation of the court system in Philadelphia but it did not involve judicial salaries."

The court noted that the Pennsylvania Constitution had vested the power to fix judicial compensation in the legislature for over 180 years, the only limitation on the legislative power being that such compensation must be "adequate." Previous constitutions contained the word "adequate," but the 1968 Constitution did not. Thus the Supreme Court of that state took the opportunity in *Glancey* to read the word "adequate" back into the Constitution:

"We agree with the appellants that, even though the Constitution of 1968 simply mandates that judicial compensation shall be 'fixed by law,' unlike the much wiser and salutary mandates of the Constitutions of 1790, 1838 and 1874, which provided that judges should 'receive for their services an adequate compensation', it is the constitutional duty and the obligation of the legislature, in order to insure the independence of the judicial (as well as the executive) branch of government, to provide compensation adequate in amount and commensurate with the duties and responsibilities of the judges involved. To do any less violates the very framework of our constitutional form of government. Almost 125 years ago, construing the Constitution of 1838, it was aptly stated: 'The mandate requiring an "adequate compensation" to be provided for "services" required of those judges is as imperative as that which prohibits its diminution during their continuance in office. The first is as obligatory as the last, springing equally with it from the great frame of government established by the paramount law, which neither legislators, governors, nor judges are at liberty to disregard. . . . It was for the safety of the people and not for the benefit of the judges that the latter were

protected from legislative usurpation. To insure their independence it was as necessary that they "shall receive an adequate compensation for their services" as to declare that the compensation when "fixed by law" shall not be "diminished during their continuance in office." ' "

On the second issue, the retroactive issue, the court held that the statute was constitutional—again being within the power of the legislature, and that the retroactivity clause was not severable, and even if it was, it would not help the appellants since its removal would mean no back pay at all.

Thus, all *Glancey* can be seen as holding is that when the constitution gives a branch an exclusive power, and that branch exercises its power in such a manner that does not interfere with the operation of another branch, the court is without power to interfere. This is really just another case supporting the concept of separation of power, rather than an inherent power case, and the Supreme Court of Pennsylvania was probably surprised to see its opinion in *Glancey* interpreted as a modification of its position so strongly stated in *Tate*.

The majority would further reject the doctrine of the inherent powers of a court on the ground that to find certain powers inherent in the courts would mean that the executive branch would also have certain inherent power and that permitting such a result would cause financial chaos in this state. I do not share this view.

There does not appear to be a body of law extant as to the inherent power of the executive branch. In general, executive power is limited to that granted by constitution or by statute:

"It is the right of executive officers named in the constitution to exercise all the powers properly belonging to the executive department.

"However, the provision in constitutions as to distribution of powers, and as

to the executive power of the state being vested in a specified officer, is declaratory and does not confer any specific powers; and, except as empowered by the constitution, executive officers may not act without legislative authority or beyond the limits established by the legislature.

\*　　\*　　\*　　\*　　\*　　\*

"Governor. The chief magistrate or governor of the state has been said to bear a relation to the state similar to that which the president bears to the United States. However, the president is manifestly an officer of higher dignity and of more extensive power than that possessed by the governor of a state; and whereas the president is vested with the federal executive power in the states the functions pertaining to the executive power are distributed among several officers, of whom the governor is the most prominent. \* \* \* The governor has no prerogative powers, but is confined to the exercise of those powers conferred on him by the constitution and statutes." 16 C.J.S. Constitutional Law § 167.

My colleagues of the majority forget that the thrust of the development of Anglo-American constitutional law has been to limit the power of the executive branch and to secure the independence of the judiciary. From the first attempts to restrain royal prerogative, symbolized by the Magna Charta, to the drafting of the Constitution of this country and the Constitution of this state, the twin threads of restraint on the executive and independence of the courts are to be found.

Restraint of the executive and the desire for an independent judiciary were compelling reasons for the issuance of the Declaration of Independence. That document, symbolic of freedom itself, recites:

"He [the executive (King George III)] has made judges dependent on his will alone for the tenure of their offices and the payment of their salaries."

Professor Hyneman in his article on bureaucracy in democratic government made the following observations:

"The representative legislative assembly is an indispensable feature of democratic government today as in the past. It was by grabbing the power first to advise the king on policy, then to veto the king's proposal, and finally to propose and decree public policy by enactment of statutes that the people of England represented in Parliament got control of their government. The failure or inability to establish sturdy and stubborn representative lawmaking bodies is a principal explanation of why the common man has not been able to get a firmer control over government in European countries. Even so, the first act of the dictator of our era [Hitler] was to destroy the representative assembly and to remove a primary source of organized opposition to his will.

"In our own country the lawmaking power was firmly lodged in Congress by the federal constitution. The President shares the power, but the construction consistently given the constitution allows him no power to decree low [sic] on his own authority except in certain specified situations, only one of which is important—the authority to act as commander-in-chief of the armed forces.

\*　　\*　　\*　　\*　　\*　　\*

"The time-honored and experience-tested way of keeping the chief executive and the administrative branch in hand is to set up a representative assembly to control them. Without exception, every nation that makes any pretense at having popular government depends on an elected assembly to restrain and guide if not to control the chief executive and the bureaucracy. As noted above the downfall of absolute monarchies was accomplished by the establishment of parliaments; and one of the very first moves of the dictator is to destroy the legisla-

tive body." Hyneman, Bureaucracy and the Democratic System, 6 La.L.Rev. 309, 315, 330 (1945).

In this state, the scope of the power of the executive has been viewed to be only as extensive as granted by the constitution. This court in deciding a case under the Constitution of 1875, which was essentially the same as the Constitution of 1901 in its statement concerning separation of powers, stated as follows:

"With us, the governor has no prerogatives. He must find warrant in the written law for his every official act. He has no more power to appoint officers, when not expressly conferred, than has the president of the senate, who is of the legislative, or the chief justice of this court, who is of the judicial department: and when we go back to our constitutions and laws, in this state, from the beginning of the state government to the present, we find it has been the policy to distribute this appointing power among the several departments of the state . . . It may be true, that the governor has been invested with the greatest share of this power, but no principle or policy has been declared that the power inherently belongs to him. And we may remark that the fact that all our constitutions, in assigning appointive power of the governor, have specifically designated the particular officers to whom it applied, furnishes cogent argument that the people did not regard the power as necessarily or inherently belonging to him." Fox v. McDonald, 101 Ala. 51, 13 So. 416 (1893).

Similarly the parallel development of judicial independence has been described. In his article, Separation of Powers: Judicial Independence, 35 Law & Contemp.Prob. 108 (1970), Senator Sam Ervin traces the development of judicial independence from Aristotle to Montesquieu, to the federal and state constitutions, and to the present era. His conclusions may be summarized in his language as follows:

"Judicial independence is the strongest safeguard against the exercise of tyrannical power by men who want to live above the law, rather than under it. The separation of powers concept as understood by the founding fathers assumed the existence of a judicial system free from outside influence of whatever kind and from whatever source, and further assumed that each individual judge would be free from coercion even from his own brethren.

\*      \*      \*      \*      \*      \*

"To my mind, an independent judiciary is perhaps the most essential characteristic of a free society. From long experience as a practicing attorney, a trial judge, an appellate judge, and now a legislator, I have had ample opportunity to observe and appreciate the safeguards embodied in the separation of powers doctrine so wisely formulated by our forefathers.

Notwithstanding these developments, the doctrine of separation of powers would prohibit either the legislature or the judiciary from interfering with a constitutionally granted executive power. See Opinion of the Justices, 291 Ala. 581, 285 So.2d 87 (1973) (Judge Fred Folsom case) in which the majority felt that anti-nepotism statute interfered with the governor's constitutional power and held the statute could not validly limit such power. While there is little doubt that the executive probably has the inherent power to protect its constitutional independence, the Folsom case illustrates that the machinery for the exercise of such power under our system is the court system itself.

Problems with respect to the legality and constitutionality of any action on the part of the executive and the reasonableness thereof are matters to be determined by the courts not "on the theory that the judiciary is in any way superior to the other co-ordinate departments, but solely on the

325

theory that [courts] . . . must enforce the constitution as the paramount law . . . ." 16 Am.Jur.2d, Constitutional Law, § 104.

The statement that financial chaos will result from upholding the inherent power doctrine, especially as applicable to the court system, is not supported by any realistic thinking. The appropriation bill for the fiscal year 1973–74 appropriated less than one-half of 1% for the operation of the entire state judicial system when compared to the total state appropriations for governmental services.

In summary, it appears that the majority's purported rejection of the doctrine of inherent power is totally unwarranted. The reasons for such action give way under close scrutiny, and the holding runs counter to the overwhelming weight of authority in this country. In taking this stance the majority places this court in the unique position of being the only court in this nation, according to my research, to reject, or so severely limit the scope as to have the effect of rejecting the doctrine. I have cited cases from Arizona, Colorado, Indiana, Massachusetts, Michigan, Missouri, Montana, Nevada, New Jersey, Oregon, Pennsylvania, and Texas which have wholeheartedly upheld the doctrine. This list is not intended to be exhaustive; indeed, the Supreme Judicial Court of Massachusetts in *O'Coins* cites additional cases from Arkansas, Illinois, Kentucky, New York, Ohio, and Wisconsin. No case has been cited either by the appellants or the majority which clearly rejects the doctrine. Furthermore, the result is not compelled by any binding precedent from this state. Thus the conclusion is inescapable that the majority's view on this issue clearly runs counter to the mainstream of modern judicial thought and tends to thwart efforts to ensure an independent judiciary.

## NEW JUDICIAL ARTICLE

On December 18, 1973, the people of this state overwhelmingly approved a fundamental reorganization of the state's judicial system. By a vote of almost two-to-one, the people approved a constitutional amendment (new judicial article) which was proclaimed on December 27, 1973 as Amendment No. 328 to the Alabama Constitution, 1901, and which laid to rest a system that served well in the 18th and 19th centuries, but which was strained by the economic, political and social conditions of the 20th century. On the old foundations, a modern judicial system has been erected, designed to meet the needs of the people of this state in the last quarter of this century, and to continue to be responsive to the kaleidoscopic challenges of modern-day life on into the 21st century.

The citizens of this state now demand a modern, responsive, effective judicial system which does not cling to the ideas and concepts of a more pristine period when problems of judicial administration were slight. For in today's complex society, just as procedure is the handmaid of justice, so too, judicial administration is the handmaid of an effective judicial system. The independence of the judiciary to do those things judicial cannot realistically be separated from the need for administrative independence if the mandate of the people for a more effective system of justice is to be fulfilled.

One can not escape some of the underlying themes of the new constitutional framework for courts when a comparison is made between the provisions of the old judicial article and the new judicial article. One of the underlying themes is a constitutional mandate that the judicial branch exercise more administrative independence.

Another underlying theme is that the Supreme Court should make the initial determination of the operating rules for the judicial system, subject only to specific restraints, in order to ensure a more effective businesslike operation of the entire court system. While many legal and judicial scholars in Alabama felt that "rule-making power" previously existed in the

326

inherent powers of the equal but separate judicial branch of government, the highest court in this state had evidenced considerable restraint in the past pertaining to the exercise of such powers. In order that the judiciary, as well as the other branches of government, understand that "rule-making power" was clearly vested within the Supreme Court, the judicial article mandated that the highest court of Alabama make and promulgate the rules of administration for all courts, as well as the rules governing practice and procedure. Regardless of whether this is construed as a constitutional transfer of authority or a clearer restatement of inherent powers, there can be no doubt that the new judicial article places the mandatory function on the Supreme Court to make the operating rules for the judicial system, subject to only specific restraints and checks. See Section 6.-11 of Amendment 328.

The instant case has been decided by a majority of the members of this court under the provisions of the old judicial article and, should not, therefore, be considered binding precedent for cases arising under the new constitutional framework.

Section 6.10 of the newly-adopted judicial article contains the following provisions:

"Adequate and reasonable financing for the entire unified judicial system *shall be provided.* Adequate and reasonable appropriations *shall be made* by the legisla-ture for the entire unified judicial system, exclusive of probate courts and municipal courts." (Emphasis added)

The constitutional mandate *"adequate and reasonable financing"* in the first sentence of the above quote is more expansive than the clause *"adequate and reasonable appropriations"* and there is no limitation of this responsibility to a specific branch following the clause "shall be provided" in the first sentence. Further, it seems clear that adequate and reasonable financing of the court system of this state is a constitutional priority for nowhere else in the Constitution do the words "adequate and reasonable" appear in relationship to financing and appropriations.[1]

While it is anticipated that judicial financing will be geared to a climate of harmony and cooperation between the legislative and judicial branches, nevertheless, there is a constitutional requirement that adequate and reasonable financing for the entire unified judicial system shall be provided even if the legislature should be remiss in complying with its constitutional mandate. In such an unlikely event, the duty to ensure the fulfillment of the people's will becomes the responsibility of the judicial branch.

The language of Section 6.10 of the newly-adopted judicial article evidences an underlying theme that the fiscal needs of the judiciary are not to be neglected. This is in keeping with the first mentioned

---

1. The proposed new judicial article in the form recommended by the Alabama Constitutional Commission and introduced in the legislature contained the following language in Section 6.10:
   "He [Chief Justice] shall submit budget recommendations to the Governor and the legislature for state appropriations for the entire unified judicial system, exclusive of probate courts."
   This was all of the language of this section pertaining to fiscal matters and appropriations.
   Section 6.10 of the judicial article as passed by the legislature and ratified by the people contains the following pertinent language:
   "Adequate and reasonable financing for the entire unified judicial system shall be provided. Adequate and reasonable appropriations shall be made by the legislature for the entire unified judicial system, exclusive of probate courts and municipal courts. The legislature shall receive recommendations for appropriations for the trial courts from the administrative director of courts and for the appellate courts from each such court."
   It is interesting to note that the legislature made substantial changes which impose mandatory fiscal obligations designed to nurture the need for greater judicial independence. It is further noteworthy that the legislature and the people approved language which no longer requires the submission of recommendations for appropriations to the Governor.

theme that the judiciary of this state act more independently in administrative matters than it has in the past. The judicial branch cannot bring about a more effective administration of justice if it is financially hamstrung.

The use of the words "adequate and reasonable" is also designed to prevent abuses. The danger of abuse can be further controlled through effective rules of administration. Following its decision in *O'Coins,* the Massachusetts Supreme Judicial Court promulgated rules designed to prevent abuses as well as to provide a method of review by any affected governmental agency. See Burke, The Inherent Powers of the Courts, 57 Judicature 247 (Jan. 1974).

The new judicial article, while building on the foundation of the old Constitution, embodies such a departure from that document by its emphasis on judicial administrative independence and adequate and reasonable financing of courts that contrary concepts, including the one voiced by the majority in the instant case, are erased. This court must proceed to view judicial administrative tasks in keeping with the mandate of the people.

## CONCLUSION

Regardless of the short life of the applicability of the majority opinion, I cannot remain silent while the majority of the court construes the applicable statute to make the circuit judges' primary task thereunder a nullity; grants to a county commission the final determination of the amount of the secretaries' salary when the language of the legislature indicates that it should only have a reasonable check; disregards the deference rationale of *Henderson* and places constitutional officers in an untenable relationship with statutory officers; upholds a defensive effort where only pleading was present without proof; disregards the law of preferred claims; and places Alabama in a single minority status to the ever-growing position of state courts throughout the nation which have squarely faced the issue of inherent power pertaining to judicial administrative matters. I must ask the inevitable question—why?

I can only conclude that my learned colleagues of the majority have a burning desire to gain again the accolade of judicial restraint. In most of their judicial decision-making undertakings I heartily concur that their judicial restraint is deserving of praise, but in the instant case the reliance on this salutary attitude is misplaced. One must distinguish the judicial administrative function from the substantive judicial decision-making function. Too much restraint in exercising administrative authority results in ineffective non-businesslike operation of the courts, the assumption of unwarranted prerogatives by governmental agencies of other branches of government, and the crumbling of the pillars of judicial independence. While judicial restraint in the substantive decision-making function is to be commended, judicial restraint towards the effective administration of justice should be condemned.

The words of Chief Justice John Marshall are just as meaningful today as when uttered over one hundred and fifty years ago: "The greatest scourge an angry heaven ever inflicted upon an ungrateful and sinning people is an ignorant, a corrupt, or a *dependent* judiciary." Debates, 1829–30 Virginia Constitutional Convention 619 (Remarks of Chief Justice John Marshall).

Hopefully, this court will exercise its administrative tasks, rule-making functions and other responsibilities under the new judicial article with a spirit of independence and effectiveness. Otherwise, the people's orchestration of a crescendo for an effective administration of justice will turn into a funeral dirge.

FAULKNER, J., concurs in the foregoing dissent.

JONES, J., concurs in the foregoing dissent with the exception of the portion dealing with the motion to recuse.

BLOODWORTH, Justice (recusing himself).

In view of the fact that while serving as a circuit judge in the Eighth Judicial Circuit of Alabama, I had a part in helping to draft and secure passage of the Act in question [Sec. 125(28a), Tit. 13, Code of Alabama 1940, as last amended], I hereby recuse myself.