[No. 44028.    En Banc.    June 24, 1976.]

*In the Matter of the Salary of the* JUVENILE DIRECTOR.

*Philip W. Borst, Prosecuting Attorney,* for appellant.

*Hamblen, Gilbert & Brooke, P.S. (William F. Nielsen,* of counsel), for respondent.

UTTER, J.—The Lincoln County Board of Commissioners appeals from a writ of mandate issued by the Superior Court directing them to increase the salary of the Lincoln County Director of Juvenile Services. The matter was heard by a superior court judge from a nearby county as an order directing appellants to show cause why the writ should not issue. In its appeal the Board questions whether, in the circumstances of this case, the respondent Superior Court properly exercised its inherent power to determine the salary of the director. Finding that respondent has failed to meet its burden of proof, we reverse the entry of the writ of mandate.

The salary of the Director of Juvenile Services for Lincoln County is provided by a state program known as the "Juvenile Subsidy Program." Under this program, the county is responsible for the nonsalary expenses of the director's office. The county pays the director's salary, but is fully reimbursed by the State. The director receives the benefit of all pay raises given state employees, as distinguished from county employees.

When the director was hired in 1973, his initial salary was established by agreement between the State, County, Superior Court, and the director. In the year following his hiring and prior to trial, his salary was increased from $9,600 to $10,560. This increase in the director's compensa-

tion, equivalent to the raise given state employees in the director's salary range for 1974, exceeded the $75 per month received by Lincoln County employees for that year. The Lincoln County Superior Court budget for 1975, submitted to the Board of Commissioners, proposed to increase the salary of the director to $12,000. This increase of approximately $125 per month, would have been the sole responsibility of the County and not reimbursed by the State. The Board rejected the court's request. Other employees of the county received a $75 per month increase during 1975. The director, although not receiving a pay increase from the Board, was to receive salary increases for state employees in 1975, if any. Following the Board's action, the Superior Court for Lincoln County in January 1975 ordered "[t]hat the County Auditor proceed to set up the Juvenile Director's salary so that it reflects a monthly payment of $125.00 per month . . . to be paid out of the County Treasury in addition to the present State Subsidy salary received by" the director. The Board notified the court that it intended to resist the order and a show cause hearing was set by the court.

At the hearing, the Superior Court Judge for Lincoln County testified he arrived at the proposed salary of $12,000 by examining the salaries of other juvenile officers in other counties in Washington. In addition, the chairman of the salary and job classification committee of the Washington Association of Juvenile Court Directors testified that directors in counties of comparable size to Lincoln County should receive a $12,500 minimum starting salary. Relying on this determination, the superior court judge stated that he believed $12,000 was fair and reasonable compensation for the position. No showing was made that other qualified employees could not be obtained at the salary established by the county commissioners. In 1974, when the director was hired, 13 applicants sought the position. There was also no evidence of the extent to which the functioning of the Superior Court would be impaired if the director's salary were not increased.

In his oral opinion, the trial judge stated that inasmuch as the Superior Court had the authority to appoint its juvenile probation officer, this authority included the right to reach agreement with that employee on the salary to be paid. He then concluded that if the Board refused to pay the salary agreed upon, if reasonable, the Superior Court was deprived of its statutory authority to appoint its Juvenile Director. Formal findings of fact entered later by the trial court found the proposed salary reasonable. The trial judge stated in conclusion of law No. 3:

> To allow the Board of County Commissioners of Lincoln County, Washington, to control Court employees by means of regulating salaries amounts to an unreasonable control over the judicial branch of government by the legislative branch of government. RCW 13.04.040 which appears to direct or authorize the Board of County Commissioners to fix the salary of the probation officer amounts to control which is an unconstitutional violation of the inherent powers of the judicial branch of the government delegated exclusively to the Courts of this State by Article IV, Section 1, of the Washington State Constitution and further is a violation of the doctrine of separation of powers.

I. Statutory Basis for the Superior Court's Order

Counsel for respondent Superior Court, relying on *Norman v. Van Elsberg*, 262 Ore. 286, 497 P.2d 204 (1972), argues the burden of proof is on appellants, the county commissioners, to show the salary increase is unreasonable before it can deny the salary request of the Superior Court. Upholding the right of the court to establish salaries without preliminary approval of the legislative branch of government, the court in *Norman* rested its decision on a particular state statute. That statute provided for the appointment of juvenile counselors at a salary designated by the judge and "approved" by the local legislative body. There, as in numerous other cases construing very similar statutory provisions, approval was held to impose upon the legislative body the burden of showing that the judge's action in setting the salary was unreasonable, *Norman v. Van Elsberg, supra* at 291, or arbitrary and capricious, *see Bird-*

*sall v. Pima County,* 106 Ariz. 266, 475 P.2d 250 (1970); *Mann v. County of Maricopa,* 104 Ariz. 561, 456 P.2d 931 (1969); *Powers v. Isley,* 66 Ariz. 94, 183 P.2d 880 (1947); *Smith v. Miller,* 153 Colo. 35, 384 P.2d 738 (1963); *Bass v. County of Saline,* 171 Neb. 538, 106 N.W.2d 860 (1960); *Commissioners Court v. Martin,* 471 S.W.2d 100 (Tex. Civ. App. 1971); *but see Morgan County Comm'n v. Powell,* 292 Ala. 300, 293 So. 2d 830 (1974).

█ Our statute governing the appointment and compensation of juvenile court officers differs significantly from the provisions construed in *Norman v. Van Elsberg, supra,* and the cases cited above. RCW 13.04.040 authorizes the Superior Court to "designate one or more persons of good character to serve as probation counselors during the pleasure of the court." However, the section also clearly states "[t]he probation counselors and persons appointed to have charge of detention facilities shall each receive compensation which *shall be fixed by the board of county commissioners* . . ." (Italics ours.) There is no suggestion in this statute that the Board is relegated to reviewing salary levels previously established by the Superior Court. The Board fixes the compensation in the first instance. Thus, there is no ambiguity and no basis to claim judicial power to fix salaries inferred from its authority to appoint.[1]

II. CONSTITUTIONAL BASIS FOR THE SUPERIOR COURT'S ORDER

The validity of respondent's action, then, must rest on the proposition, adopted by the trial court, that the act of

---

[1]We do not imply that the legislature is unable to authorize a different role for the judiciary in the budget process. As discussed in this opinion, the judicial function is not limited to adjudication. Essential to the modern judiciary, and increasingly implemented, are efficient methods of court administration, including workable budgeting processes. *See, e.g., National Center for State Courts, Washington Appellate Courts Project* (1975); R. Lowe, *Unified Courts in America: The Legacy of Roscoe Pound,* 56 Judicature 316 (1973); C. McGowan, *The Shape of Reform: Drafting the Court Organization Standards,* 58 Judicature 28 (1974); G. Hazard, Jr., *A Constitution for the Courts,* 58 Judicature 34 (1974); Comment, *Court Finance and Unitary Budgeting,* 81 Yale L.J. 1286 (1972); C. Baar, *Separate but Subservient: Court Budgeting in the American States* (1975) and sources cited in the notes.

setting salaries for court personnel in the circumstances of this case is a proper exercise of inherent judicial power and that contrary action by the legislative branch violates the principle of separation of powers. This action by the trial court, in effect, allocates public resources to the court system beyond those designated by the legislative or executive branches. The order thus emphasizes the awkward position of courts in the governmental budgeting process. No authority rests in the judiciary to appropriate funds, as a legislative body does, nor to exercise the power of the veto as a bargaining device, as may the executive. In most states, its only means of direct participation in the budgeting process is by intervention, in the form of litigation, to compel the payment of funds for the court system. The wisdom of such judicial intervention has been the source of vigorous debate both in cases and commentary.[2]

Any inquiry into the propriety of court action to compel funding of its own functions must begin with an examination of the theoretical underpinnings of the doctrines of separation of powers, checks and balances, and inherent judicial power. The constitutions of the nation and the states are imbued with these and other principles of government developed during the revolutionary era. Prominent in the political thought of two centuries ago, these

---

[2]*Compare Commonwealth ex rel. Carroll v. Tate*, 442 Pa. 45, 274 A.2d 193 (1971) *with Morgan County Comm'n v. Powell*, 292 Ala. 300, 293 So. 2d 830 (1974); *see* C. Baar, *Separate but Subservient: Court Budgeting in the American States* (1975); Brennan, *Judicial Fiscal Independence*, 23 U. Fla. L. Rev. 277 (1971); J. Burke, *The Inherent Powers of the Courts*, 57 Judicature 247 (1974); J. Connors, *Inherent Power of the Courts—Management Tool or Rhetorical Weapon?*, 1 Justice System J. 63 (1974); Comment, *Court Finance and Unitary Budgeting*, 81 Yale L.J. 1286 (1972); Note, *Judicial Financial Autonomy and Inherent Power*, 57 Cornell L. Rev. 975 (1972); *Constitutional Law: The Inherent Power of the Courts to Appropriate Money for "Reasonably Necessary" Expenditures*, 55 Marquette L. Rev. 392 (1972); Comment, *Inherent Power and Administrative Court Reform*, 58 Marquette L. Rev. 133 (1975); Comment, *Courts—Judge's Power to Bind Contractually County Treasury for Courtroom Necessities*, 7 Suffolk U. L. Rev. 1136 (1972); Comment, *State Court Assertion of Power to Determine and Demand Its Own Budget*, 120 U. Pa. L. Rev. 1187 (1972).

three interrelated, yet distinct, doctrines are major constituents of our governmental framework. At least 26 distinct provisions of the federal constitution are founded on the separation of powers principle, "about half of which are to accomplish functional separation; the other half being defensive checks, balances and weapons for departmental self preservation." Brand, *Montesquieu and the Separation of Powers*, 12 Ore. L. Rev. 175, 177 (1933).

*The Development of the Separation of Powers Doctrine.*

Although a concept with a long history, the first modern expression of the doctrine of separation of governmental powers occurred in eighteenth century England and France. *See* Ervin, *Separation of Powers: Judicial Independence*, 35 Law & Contemp. Prob. 108 (1970); Fairlie, *The Separation of Powers*, 21 Mich. L. Rev. 393 (1922). John Locke, Henry St. John, Viscount Bolingbroke, and Baron de Montesquieu were influential proponents of their individual versions of the doctrine. Its essence was described by Montesquieu:

> All would be lost if the same man or the same body of leaders, either of the nobles or of the people, exercised these three powers: that of making laws, that of executing the public resolutions, and that of judging criminal and civil cases.

W. Gwyn, *The Meaning of the Separation of Powers* 110 (1965). As the doctrine subsequently developed it combined with other ideas complementing and modifying the pure separation of powers principle.

> The most important of these modifications lies in the amalgamation of the doctrine with the theory of mixed government, or with its later form, the theory of checks and balances. . . . from an analytical point of view the main consideration is that these theories were used to import the idea of a set of *positive* checks to the exercise of power into the doctrine of the separation of powers. That is to say that each branch was given the power to exercise a degree of *direct* control over the others by authorizing it to play a part, although only a limited part, in the exercise of the other's functions. Thus the executive branch was given a veto power over legislation, or

the legislative branch was given the power of impeachment. The important point is that this power to "interfere" was only a limited one, so that the basic idea of a division of functions remained, modified by the view that each of the branches could exercise *some* authority in the field of all three functions. This is the amalgam of the doctrine of the separation of powers with the theory of checks and balances which formed the basis of the United States Constitution. Related to this, and to its predecessor in time, is an amalgam of the doctrine of the separation of powers with the theory of mixed government to produce a *partial separation of functions.* That is to say that one function, the legislative, was to be shared, but other functions were to be kept strictly separate. This was a basic element in eighteenth century English constitutionalism, the theory of balanced government. These modifications of the doctrine have of course been much more influential than the doctrine in its pure form.

M.J.C. Vile, *Constitutionalism and the Separation of Powers* 18-19 (1967).

With the growth of revolutionary fervor in the American colonies, the theory of the balanced constitution was broken down into its component parts, so that by 1776 separation of powers was being advanced as the only coherent constitutional theory upon which an alternative to colonial forms of government could be based. M.J.C. Vile, *supra* at 126. However, the state constitutions framed in 1776 and 1777, some expressly embodying the doctrine, produced undesired legislative supremacy and a realization of the shortcomings of the doctrine standing alone. Thomas Jefferson noted as a "capital defect" of the Virginia Constitution that "[a]ll the powers of government, legislative, executive, and judiciary, result to the legislative body. The concentrating [of] these in the same hands is precisely the definition of despotic government." T. Jefferson, *Notes on the State of Virginia* 120 (W. Peden ed. 1954). This experience, coupled with consistent adherence by John Adams and others to the notion of balanced government accomplished by a mixed constitution, *see* W. Gwyn, *supra* at 116-23, made the notion of "checks and balances" again acceptable among the revo-

240

lutionaries by 1787. *See also* G. Wood, *The Creation of the American Republic, 1776-1787,* 150-61, 449-53, 548-60 (Norton Library ed. 1969).

Because of its generality, the doctrine of separation of powers does not stand as a definitive guide to intergovernmental relations. It is, nevertheless, "the dominant principle of the American political system." G. Wood, *supra* at 449. Hence, like other broad constitutional provisions, such as the commerce and due process clauses, the doctrine has been often invoked by the courts and given more definite content in the process. *See, e.g., Kilbourn v. Thompson,* 103 U.S. 168, 26 L. Ed. 377 (1880); *Myers v. United States,* 272 U.S. 52, 71 L. Ed. 160, 47 S. Ct. 21 (1926); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 96 L. Ed. 1153, 72 S. Ct. 863, 26 A.L.R.2d 1378 (1952); *United States v. Brown,* 381 U.S. 437, 14 L. Ed. 2d 484, 85 S. Ct. 1707 (1965); *New York Times Co. v. United States,* 403 U.S. 713, 714, 29 L. Ed. 2d 822, 91 S. Ct. 2140 (1971) (Black, J., concurring); *United States v. Nixon,* 418 U.S. 683, 704, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974). The constitutions of the several states, inheritors of the federal constitutional legacy, also embody the principle. *Zylstra v. Piva,* 85 Wn.2d 743, 754, 539 P.2d 823 (1975) (Utter, J., concurring); *see, e.g., State ex rel. Brotherton v. Blankenship,* ――――― W. Va. ―――――, 214 S.E.2d 467 (1975); *Leek v. Theis,* 217 Kan. 784, 539 P.2d 304 (1975); *Department of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 334 A.2d 514 (1975); *MacManus v. Love,* 179 Colo. 218, 499 P.2d 609 (1972). Despite its generality, the separation of powers doctrine "is currently notable not for its demise, but . . . for its extraordinary resilience." Frohnmayer, *The Separation of Powers: An Essay on the Vitality of a Constitutional Idea,* 52 Ore. L. Rev. 211, 216 (1973).

*The Development of the Concept of Checks and Balances.*

█ The evolution of constitutional ideas during the revolutionary period had an important impact on the American notion of the role of the judiciary. While some form of separation of powers is a prerequisite for judicial

review, separation in itself is not a sufficient basis for such authority.

> [I]t is in the Federal [Constitutional] Convention, with its highly developed conception of the relation between the separation of powers and checks and balances, that we find the evidence of the belief that judges must have the power to check the legislature by limiting it to its proper functions. *Here* is the solution to the problem of the use by the legislature of "the forms of legislation" to achieve improper ends which had puzzled the early constitutionalists. Should the executive veto be insufficient to restrain the legislature then the courts would be able to declare unconstitutional acts void. The evidence of the blossoming of this view of judicial power in the Convention and in the *Federalist* is most impressive.

M.J.C. Vile, *Constitutionalism and the Separation of Powers* 158 (1967). "The department of government which benefited most from [the] new, enlarged definition of separation of powers was the judiciary." G. Wood, *supra* at 453-54.

Both history and uncontradicted authority make clear that " '[i]t is emphatically the province and duty of the judicial department to say what the law is.' " *United States v. Nixon, supra* at 703, quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176, 2 L. Ed. 60 (1803), even when that interpretation serves as a check on the activities of another branch or is contrary to the view of the constitution taken by another branch. *Powell v. McCormack*, 395 U.S. 486, 549, 23 L. Ed. 2d 491, 89 S. Ct. 1944 (1969); *Tacoma v. O'Brien*, 85 Wn.2d 266, 534 P.2d 114 (1975). As stated in *Baker v. Carr*, 369 U.S. 186, 211, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962):

> Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.

Thus, even in enforcing the separation of powers, courts must intervene in the operation of other branches. This is

no inconsistency in constitutional theory, since complete separation was never intended and overlapping functions were created deliberately. James Madison pointed out that even in the early state constitutions in which the separation of powers doctrine was set forth in "unqualified terms", as noted above, "there is not a single instance in which the several departments of power have been kept absolutely separate and distinct." The Federalist No. 47, at 141 (R. Fairfield ed. 1966) (J. Madison). It is an oversimplification to view the doctrine as establishing analytically distinct categories of government functions. *See In re Salaries for Probation Officers*, 58 N.J. 422, 425, 278 A.2d 417 (1971); *cf. Board of Comm'rs v. Gwin*, 136 Ind. 562, 585-87, 36 N.E. 237 (1894). The division of government into three parts, observed a radical Pennsylvania pamphleteer in 1776, " 'is more a distinction of words than things. Every king or governor in giving his assent to laws acts legislatively, and not executively: the House of Lords in England is both a legislative and judicial body. In short, the distinction is perplexing.' " G. Wood, *supra* at 152. If government functions were to be cleanly compartmentalized, it is difficult to see, for example, how legislatures constitutionally could create administrative agencies with power to enact rules, conduct investigations, and formally adjudicate individual rights and privileges. Frohnmayer, *supra* at 217. Similarly, the judicial function extends beyond the determination of questions in controversy and includes functions necessary or incidental to the adjudicative role. *Cf. Galloway v. Truesdell*, 83 Nev. 13, 422 P.2d 237 (1967). A court's authority "is not limited to adjudication, but includes certain ancillary functions, such as rule-making and judicial administration, which are essential if the courts are to carry out their constitutional mandate." *O'Coin's, Inc. v. Treasurer*, 362 Mass. 507, 287 N.E.2d 608, 611 (1972).

This overlapping of functions allows for the scheme of checks and balances which, as noted above, evolved side-by-side with and in response to the separation of powers concept. Legislative control over appropriations, *see* U.S.

Const. art. 1, §§ 8, 9; Const. art. 8, § 4; *Train v. New York*, 420 U.S. 35, 43 L. Ed. 2d 1, 95 S. Ct. 839 (1975), the executive power to veto, *see* U.S. Const. art. 1, § 7; Const. art. 3, § 12, and the judicial authority to declare legislative and executive acts unconstitutional, *see United States v. Nixon, supra* at 703-05; *Gruen v. State Tax Comm'n*, 35 Wn.2d 1, 9, 211 P.2d 651 (1949), are all examples of direct control by one branch over another. *See Ex Parte Grossman*, 267 U.S. 87, 119-20, 69 L. Ed. 527, 45 S. Ct. 332, 38 A.L.R. 131 (1925). Taken together these devices constitute a delicate balance, described by Justice Jackson, concurring in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 96 L. Ed. 1153, 72 S. Ct. 863, 26 A.L.R.2d 1378 (1952):

> The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

*See O'Coin's, Inc. v. Treasurer, supra.*

*Inherent Judicial Power: A Constitutional Imperative.*

The spirit of reciprocity and interdependence requires that if checks by one branch undermine the operation of another branch or undermine the rule of law which all branches are committed to maintain, those checks are improper and destructive exercises of the authority. A recent study of court finance and separation of powers suggests that intragovernmental checks which are not sufficiently timely or direct to allow the other branch an opportunity to carry out its constitutional functions are improper. C. Baar, *Separate but Subservient: Court Budgeting in the American States* 153 (1975). As examples of such indirect checks, Professor Baar cites the 1965 Congressional decision to exclude United States Supreme Court Justices from the general salary increases for federal judges. Such fiscal control may be improperly exercised when direct means are avail-

able to the legislative branch to overrule or limit specific judicial decisions. An illustration of rules which encourage timely checks on the activities of the legislature and executive branches is the judicially developed principle of exhaustion of administrative remedies under which court intervention is delayed until the agency has an opportunity to pass on the matter. *See, e.g., Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 82 L. Ed. 638, 58 S. Ct. 459 (1938); *Wright v. Woodard*, 83 Wn.2d 378, 518 P.2d 718 (1974). Although the judiciary possesses authority to check the arbitrary or unconstitutional exercise of power by legislative and executive branches, it is the only branch excluded from participation in the formulation and adoption of the government budget. Such exclusion makes the courts vulnerable to improper checks in the form of reward or retaliation. A historical parallel may be drawn to the use of the King's purse to obtain the loyalty of Parliament—a practice violative of even the then nascent notion of separation of powers. Judicial freedom from improper influence is essential.

> The reason for the independence of the judiciary . . . and incidentally of juries, is not that they perform a judicial function, an expression to which it is very difficult to give a precise meaning. The argument for the independence of the judge is that in performing his function of rule-interpretation he should not be subject to pressure that would cause him to vary the meaning of the rules to suit the views of the persons affected by them, and that in ascertaining "facts" he will not be influenced by considerations of expediency. It is an essential element in the maintenance of that stability and predictability of the rules which is the core of constitutionalism.

M.J.C. Vile, *Constitutionalism and the Separation of Powers* 328-29 (1967). *See also* National Conference of Court Administrators and Conference of Chief Justices, *Statement of Principles: The Need for Independence in Judicial Administration*, 50 Judicature 129 (1966). "Our sense of justice tells us that a court is not free if it is under financial

pressure . . ." *Carlson v. State ex rel. Stodola,* 247 Ind. 631, 633, 220 N.E.2d 532 (1966).

While courts must limit their incursions into the legislative realm in deference to the separation of powers doctrine, separation of powers also dictates that the judiciary be able to insure its own survival when insufficient funds are provided by the other branches. To do so, courts possess inherent power, that is, authority not expressly provided for in the constitution but which is derived from the creation of a separate branch of government and which may be exercised by the branch to protect itself in the performance of its constitutional duties.

> It is axiomatic that, as an independent department of government, the judiciary must have adequate and sufficient resources to ensure the proper operation of the courts. It would be illogical to interpret the Constitution as creating a judicial department with awesome powers over the life, liberty, and property of every citizen while, at the same time, denying to the judges authority to determine the basic needs of their courts as to equipment, facilities and supporting personnel.

*O'Coin's, Inc. v. Treasurer,* 362 Mass. 507, 287 N.E.2d 608, 611-12 (1972). The doctrine's purpose is "to preserve the efficient and expeditious administration of Justice and protect it from being impaired or destroyed." *Commonwealth ex rel. Carroll v. Tate,* 442 Pa. 45, 53, 274 A.2d 193 (1971), *cert. denied,* 402 U.S. 974, 29 L. Ed. 2d 138, 91 S. Ct. 1665 (1971).

The inherent power of the judiciary to compel funding of its own functions is only one of many forms that power may take. Other uses of a court's inherent power include the ability to punish for contempt, *see Wood v. Georgia,* 370 U.S. 375, 380, 8 L. Ed. 2d 569, 82 S. Ct. 1364 (1962); *Mead School Dist. 354 v. Mead Educ. Ass'n,* 85 Wn.2d 278, 534 P.2d 561 (1975); to insure a fair criminal trial, *see Sheppard v. Maxwell,* 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966); to appoint counsel for a criminal defendant, *see Powell v. Alabama,* 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55, 84 A.L.R. 527 (1932); to grant bail, *see State ex rel.*

*Syverson v. Foster*, 84 Wash. 58, 146 P. 169 (1915); to review actions of public officials, *see Pettit v. Board of Tax Appeals*, 85 Wn.2d 646, 538 P.2d 501 (1975); to compel attendance of witnesses and the production of evidence, *see State ex rel. Haugland v. Smythe*, 25 Wn.2d 161, 169 P.2d 706, 165 A.L.R. 1295 (1946); to regulate practice of law, *see State v. Cook*, 84 Wn.2d 342, 525 P.2d 761 (1974); *In re Patton*, 86 N.M. 52, 519 P.2d 288 (1974); to control photography in court, *see Ex parte Sturm*, 152 Md. 114, 136 A. 312 (1927); to honor letters rogatory, *see Ex parte Taylor*, 110 Tex. 331, 220 S.W. 74 (1920). *See also New York Times Co. v. United States*, 403 U.S. 713, 752 n.3, 29 L. Ed. 2d 822, 91 S. Ct. 2140 (1971) (Burger, J., dissenting); *In re Surcharge of County Comm'rs*, 12 Pa. D. & C. 471, 481-83 (C.P. Lackawanna County 1928); Mallard, *Inherent Power of the Courts of North Carolina*, 10 Wake Forest L. Rev. 1 (1974).

The proposition that courts possess an implied power to compel the expenditure of public funds for their own operation is not a recent innovation. In 1838 the Supreme Court of Pennsylvania upheld the authority of a trial court to sequester a jury and require the county commissioners to pay the expenses incurred. *Commissioners v. Hall*, 7 Watts 290 (Pa. 1838). The court stated, at page 291:

> It is the undoubted duty of the court to prescribe the manner of [a juror's] treatment and keeping; and it must sometimes occasion unusual expense. . . . [This cost] must be at the public charge, for it is as much a part of the contingent expenses of the court, as is the price of the fire wood and candles consumed in the court room.

*See Hall v. Washington County*, 2 Iowa 473 (1850); *Carpenter v. County of Dane*, 9 Wis. 274 (1859) (compensation of counsel appointed by court for indigent). In the case *State ex rel. Howard v. Smith*, 15 Mo. App. 412 (1884), the court issued a writ of mandamus to the city auditor to pay court expenses for a janitor. The court based its decision on the separation of powers doctrine:

> The legislative, judicial, and executive departments of the government are distinct. . . . The legislature raises and applies the revenue, and thus holds the public

purse; but, though it possesses the larger share of power, it is no more a representative of the sovereign power than are either of the other departments; and the courts will always so interpret legislative enactments as to preserve the proper independence of the judiciary and the executive. Where a deficiency of public accommodation requires an expenditure by a court, it must be at the public charge . . .

*State ex rel. Howard v. Smith, supra* at 422. In 1886 a New York court declared "there is an inherent power of the court . . . to incur such expense as may judicially be determined to be necessary in cases of exigency, to maintain authority, punish offenders, and prevent the miscarriage of justice." *People ex rel. Cole v. Board of Supervisors*, 46 N.Y. 299, 300 (1886). This inherent judicial power has been often exercised and remains an active legal principle.[3] *See* J. Carrigan, *Inherent Powers of the Courts* (National College of the State Judiciary 1973); *Inherent Power of Court to Compel Appropriation or Expenditure of Funds for Judicial Purposes*, Annot., 59 A.L.R.3d 569 (1974).

Despite this attention, the application of the principle of inherent power as it applies to the judiciary is not yet fully developed. Moreover, a recent examination of the effectiveness and impact of lawsuits based on the principle concluded that such excursions outside the normal political process could have an adverse effect on working relations

---

[3]Professor Baar's study identifies several characteristics of lawsuits based on inherent judicial power to compel funding: they produce strong language on the importance of an independent judiciary and can be a tool for increasing the contribution to court financing; they can increase central administrative controls within a court system; they are directed primarily at local as distinguished from state budget authorities and are usually for marginal increases in personnel or equipment shown to have been previously required; they are used as a last resort or on an ad hoc basis where the remedy sought is generally by mandamus or declaratory judgment; and compliance with the decrees of the courts has been problematic. C. Baar, *Separate but Subservient: Court Budgeting in the American States* 144-46 (1975). Another evaluation of such litigation noted "[a]s applied to date, it has been more bountiful in legal rhetoric than in practical consequences." Comment, *Court Finance and Unitary Budgeting*, 81 Yale L.J. 1286, 1288 (1972).

between other branches of government and weaken public support for the judiciary. C. Baar, *supra* at 147-49. This is so even if such suits are successful at a local level and even if they strengthened the bargaining position of the courts. Thus, the search for the proper degree of "separateness but interdependence, autonomy but reciprocity" (*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 96 L. Ed. 1153, 72 S. Ct. 863, 26 A.L.R.2d 1378 (1952) (Jackson, J., concurring)) in the context of court finance has been a difficult one and one that is not yet complete.

*The Balance of Autonomy and Reciprocity in Judicial Financing.*

By its nature, litigation based on inherent judicial power to finance its own functions ignores the political allocation of available monetary resources by representatives of the people elected in a carefully monitored process. *See generally Baker v. Carr*, 369 U.S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962); *Reynolds v. Sims*, 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964); *Mahan v. Howell*, 410 U.S. 315, 35 L. Ed. 2d 320, 93 S. Ct. 979 (1973); *Gaffney v. Cummings*, 412 U.S. 735, 37 L. Ed. 2d 298, 93 S. Ct. 2321 (1973). Supreme Courts, obviously, are not composed of judges elected in a proportionally representative manner. The unreasoned assertion of power to determine and demand their own budget is a threat to the image of and public support for the courts. In addition, such actions may threaten, rather than strengthen, judicial independence since involvement in the budgetary process imposes upon the courts at least partial responsibility for increased taxes and diminished funding of other public services. Those groups whose interests are adversely affected, legitimately may respond with standard political sanctions, including threats of impeachment, tighter control over judicial selection, and opposition to the individual judge who initiates budgetary intervention. Alternatively, less drastic and more permanent solutions to problems of court finance are available.[4]

---

[4]Examples of techniques which may be employed to limit the need to resort to lawsuits based on inherent power include the following:

The judiciary is isolated from the opinion gathering technique of public hearings as well as removed from politically sensitive, proportionately elected representatives. By in effect initiating and trying its own lawsuits, the judiciary's image of impartiality and the concomitant willingness of the public to accept its decisions as those of a fair and disinterested tribunal may be severely damaged.[5]

If separation of powers has as a basic element the preservation of the rule of law, court decisions must not be biased in favor of court funding. This admonition applies with equal vigor to the exercise of executive or legislative discretion in such a way that it appears to create a bias in favor of those branches, to the detriment of the judiciary.

■ These considerations, as well as recognition that inherent power derives from the need to protect the functioning of an independent branch, have led courts to set a

---

(1) lump sum budgets for courts granting authority to courts to make internal allocations; (2) self-imposed restrictions by the legislative and executive branches on the degree of internal controls they seek to exercise over the internal authority of judicial administrative bodies; (3) constitutional prohibitions against legislative reduction of judicial budget requests of the nature found in West Virginia (W. Va. Const. art. 6, § 51(5)); (4) sum sufficient budgeting for the courts to allow them to spend in excess of legislative appropriations as found in Wisconsin; (5) earmarking of a fixed portion of the total state revenue for the judicial system in the constitution; (6) funding courts by increased user fees; (7) inclusion in the state constitution of a standard for legislative appropriations like that found in article 6, section 10 of the new Alabama Judicial Article which provides " '[a]dequate and reasonable financing for the entire unified judicial system shall be provided. Adequate and reasonable appropriations shall be made by the legislature for the entire unified judicial system, exclusive of probate courts and municipal courts.' " C. Baar, *supra* at 158-61; (8) removal of funding from counties and municipalities and placing it entirely with the state; (9) increased communication and cooperation between the other branches of government by establishing independent or inter-branch commissions; and (10) development of an effective lobbying effort for the courts by the bench, bar, and concerned citizen groups. Comment, *State Court Assertion of Power to Determine and Demand Its Own Budget*, 120 U. Pa. L .Rev. 1187, 1206-08 (1972).

[5]On the other hand, as noted in *Commonwealth ex rel. Carroll v. Tate*, 442 Pa. 45, 55-56, 274 A.2d 193 (1971), the confidence and trust of the public and the bar also depends on the efficient, competent administration of justice secured through adequate funding of the courts.

high standard for the application of inherent power in funding matters. The burden is on the court to show that the funds sought to be compelled are reasonably *necessary* for the holding of court, the efficient administration of justice, or the fulfillment of its constitutional duties. *Commonwealth ex rel. Carroll v. Tate, supra*; *O'Coin's, Inc. v. Treasurer*, 362 Mass. 507, 287 N.E.2d 608 (1972); *Wayne Circuit Judges v. Wayne County*, 386 Mich. 1, 190 N.W.2d 228 (1971); *Carlson v. State ex rel. Stodola*, 247 Ind. 631, 220 N.E.2d 532 (1966); *State ex rel. Weinstein v. St. Louis County*, 421 S.W.2d 249 (Mo. 1967). In addition, it is generally recognized, as stated in the oft-quoted case *State ex rel. Hillis v. Sullivan*, 48 Mont. 320, 329, 137 P. 392 (1913), that inherent power is to be exercised only when established methods fail or when an emergency arises. *See Leahey v. Farrell*, 362 Pa. 52, 59-60, 66 A.2d 577 (1949).

However, as noted in *Carlson v. State ex rel. Stodola, supra* at 638-39, when courts decide to act on their own behalf, the citizenry is the final arbiter of interbranch disputes. In that case, the court directed the county to pay increased sums for court personnel and operations, but also stated "there comes a time when a judge or any other public official must make an accounting to the voters for his actions, if arbitrary, extravagant or not in the public interest, and that is true of . . . any judge . . . [or] the one who exercises the appointing power." The accountability of every public official is a practical strain in the constitutional thought of this country from the earliest times. "The only true corrective for the abuse of constitutional power, said Jefferson, is the elective power of the people . . ." M.J.C. Vile, *supra* at 166. While this statement reflects Jefferson's view that checks and balances were unnecessary since a frequent vote of the people would assure the independence of governmental branches, it also clearly points to the electorate as the final arbiter in interbranch disputes. Jefferson's philosophy is reflected in the provisions of state and federal constitutions by which executive,

legislative, and judicial officers are elected, and the constitution itself submitted for ratification by the citizens.

The electoral power of the people is not the primary reason for requiring courts to fully support and clearly state the justifications for their exercise of inherent power. As an element in the administration of justice, the use of overt force is largely latent now. Courts infrequently find it necessary to enforce their decrees by coercion. While the enforcement capability must remain viable, public sentiment is an essential ingredient of compliance with court orders. "Indeed it is indispensable, for a system of law based entirely on coercion without any degree of popular acceptance would be too insecure to provide stability and permanence." P. Fitzgerald, *Salmond on Jurisprudence* 89 (12th ed. 1966).

Hence, it is incumbent upon courts, when they must use their inherent power to compel funding, to do so in a manner which clearly communicates and demonstrates to the public the grounds for the court's action. This can be accomplished by imposing on the judiciary the highest burden of proof in civil cases when courts seek to exercise their inherent power in the context of court finance. *See, e.g., In re Estate of Reilly*, 78 Wn.2d 623, 629, 479 P.2d 1, 48 A.L.R.3d 902 (1970); *Bland v. Mentor*, 63 Wn.2d 150, 154-55, 385 P.2d 727 (1963); *Holmes v. Raffo*, 60 Wn.2d 421, 426, 374 P.2d 536 (1962). Lacking clear, cogent, and convincing proof of a reasonable need for additional funds, it is unlikely the court would be willing to use its contempt power to enforce compliance with its fiscal determination. Thus, in circumstances where courts have been unable to build a convincing case, compliance with their financing orders has been problematic.[6] "[W]hile the Constitution has made the

---

[6]In *Wayne Circuit Judges v. Wayne County*, 386 Mich. 1, 190 N.W.2d 228 (1971), the court held that circuit judges had inherent authority to hire law clerks and a judicial assistant, to fix their compensation, and to require the county to appropriate funds to pay the compensation. The court's decision, however, has been ignored by the county. C. Baar, *Separate but Subservient: Court Budgeting in the American States* 147 (1975). Similarly, the Philadelphia Court of Common Pleas has never

Judiciary as independent of the other branches as is practicable, it is, as often remarked, the weakest of the three. It must look for a continuity of necessary cooperation, in the possible reluctance of either of the other branches, to the force of public opinion." *Ex parte Grossman*, 267 U.S. 87, 120, 69 L. Ed. 527, 45 S. Ct. 332, 38 A.L.R. 131 (1925).

In the present controversy, there is a fundamental failure of proof by respondent Superior Court. No evidence in the record supports by a preponderance of the evidence—let alone by a clear, cogent, and convincing showing—respondent's determination that the salary paid to the Director of Juvenile Services was so inadequate that the court could not fulfill its duties. Neither does the record show that an increase in salary was reasonably necessary for the efficient administration of justice. *See In re Haberstroh*, 20 Pa. Cmwlth. 1, 340 A.2d 603 (1975). Lacking such proof, there is no basis for the exercise of inherent power in the circumstances of this case, and respondent's attempt to do so imposed an improper check on the function of the legislative branch of government. No issue was raised by the parties regarding the Superior Court's inability to perform a constitutionally-mandated function. Likewise, no issue was raised regarding the nature of the proceedings which brought this case before the Superior Court.

Judgment reversed.

HUNTER, HAMILTON, BRACHTENBACH, and HOROWITZ, JJ., concur.

STAFFORD, C.J. (concurring)—I agree with the majority

received any of the $1,365,555 awarded by the court in *Commonwealth ex rel. Carroll v. Tate*, 442 Pa. 45, 274 A.2d 193 (1971). C. Baar, *supra*. In both cases, the court's determination of necessary funding was made without regard to the financial condition of the county. *Wayne Circuit Judges v. Wayne County*, 383 Mich. 10, 34, 172 N.W.2d 436, 446 (1969) (separate opinion of Black, J., adopted as opinion of court); *Commonwealth ex rel. Carroll v. Tate, supra* at 56. The public's willingness to accept the decisions of a fair and disinterested tribunal is undermined by a court's failure to consider relevant circumstances in its determination of financial need, which in turn may affect the willingness of the court to use its contempt powers.

opinion in all but one matter. At page 251 the majority would impose on the judiciary "the highest burden of proof in civil cases when courts seek to exercise their inherent power in the context of court finance." The majority then employs the "clear, cogent, and convincing evidence" test. I disagree with the overly strict burden of proof employed by the majority. The normal "preponderance of the evidence" test is most appropriate, and I would so hold.

While the burden of proof is an important issue in the overall consideration of "inherent power" it does not change the result in this case. Thus, I concur with the one reservation.

ROSELLINI, WRIGHT, and BRACHTENBACH, JJ., concur with STAFFORD, C.J.