**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILED
12/27/2022
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JENNIFER RALSTON, CALEB MCNAMARA AND THE ESTATE OF MCNAMARA; BRAEDEN SIMON, ABIE EKENEZER, JESSE HUGHEY, TIM KAUCHUK, JORDAN PICKETT, DANIEL PIERCE, SEAN SWANSON, JOEY WIESER, QUINN ZOSCHKE, JEFF CUSHMAN, | No. 84142-4-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |
| Appellants, | |
| v. | |
| STATE OF WASHINGTON, a governmental entity, | |
| Respondent. | |

SMITH, A.C.J. — Several plaintiffs bring this putative class action lawsuit against the State. They claim that it has underfunded the Washington courts in violation of its constitutional duties, that the ensuing court congestion has delayed their civil cases and thereby caused them harm, and that they represent a class of plaintiffs similarly harmed. The trial court dismissed the case for failure to state a claim upon which relief can be granted.

We affirm, concluding that only the judiciary may use its inherent power to compel the legislature to better fund the courts and that no other power allows the plaintiffs their requested remedy.

No. 84142-4-I/2

FACTS

This case is a putative class action brought by a number of plaintiffs. Each is also plaintiff in a separate civil action. They claim that those underlying civil lawsuits have seen their trials delayed because of systemic court underfunding. They bring this action against the State in an attempt to compel greater funding for the judiciary.

The underlying actions are varied and their trial dates have been postponed for a number of reasons. Jennifer Ralston and Caleb McNamara filed their case in 2015. That case still awaited trial as of the filing of the complaint in this putative class action because the court granted a defense motion to continue brought on account of claimed complications in discovery. The order allowed the parties to file a motion for expedited trial, though it is unclear from the record whether they did.

Braeden Simon commenced his case in September, 2020. After a judicial reassignment, trial was rescheduled by the court from September 7, 2021 to February 16, 2022, the next available jury trial date, because of a "scheduling conflict."

Abie Ekenezer, Jessey Hughey, Tim Kauchak, Jordan Pickett, Daniel Pierce, Sean Swanson, Joey Wieser, and Quinn Zoschke, along with around 45 other individuals, are plaintiffs in a lawsuit filed in September, 2020 and amended in April, 2021. Trial was moved forward a year and a half, from September 27, 2021 to February 21, 2023, after the defendants asked for a three-year

2

No. 84142-4-I/3

continuance because of the complexity of the case, which involves voluminous discovery and more than 500 disclosed witnesses.

Jeff Cushman initiated his underlying lawsuit in October, 2020. The matter was consolidated with other similar cases and a third amended complaint was filed in August, 2021. The court moved the trial date to March, 2022.

Together, these plaintiffs sue the State on behalf of a larger putative class of plaintiffs suffering the impact of delays in their civil trials. They do so because the State plays a role in funding the courts[1] and, they allege, it is failing to fulfil that role. They contend that their trials' continuances harmed them and were ultimately caused by the State's failure to adequately fund the courts. They seek a declaration of their rights and injunctive relief under the Uniform Declaratory Judgments Act (UDJA), ch. 7.24 RCW, requesting that the judiciary compel greater court funding from the legislature.

---

[1] It is a limited role. Our state constitution provides:

> The salaries of the judges of the supreme court shall be paid by the state. One-half of the salary of each of the superior court judges shall be paid by the state, and the other one-half by the county or counties for which he is elected. In cases where a judge is provided for more than one county, that portion of his salary which is to be paid by the counties shall be apportioned between or among them according to the assessed value of their taxable property, to be determined by the assessment next preceding the time for which such salary is to be paid.

WASH. CONST. art. IV, § 13. What the State does not pay, the counties do: "The county in which the court is held shall furnish the courthouse, a jail or suitable place for confining prisoners, books for record, stationery, lights, wood, attendance, and other incidental expenses of the courthouse and court which are not paid by the United States." RCW 2.28.139.

No. 84142-4-I/4

The trial court granted the State's motion to dismiss the action with prejudice. The plaintiffs sought direct review from the Washington Supreme Court, which declined review by a June 8, 2022 order.

ANALYSIS

Standard of Review

A trial court's decision to dismiss a case under CR 12(b)(6) is reviewed de novo. Kinney v. Cook, 159 Wn.2d 837, 842, 154 P.3d 206 (2007). "Dismissal is warranted only if the court concludes, beyond a reasonable doubt, the plaintiff cannot prove 'any set of facts which would justify recovery.' " Kinney, 159 Wn.2d 837 at 842 (quoting Tenore v. AT&T Wireless Servs., 136 Wn.2d 322, 329-30, 962 P.2d 104 (1998)). "The court presumes all facts alleged in the plaintiff's complaint are true and may consider hypothetical facts supporting the plaintiff's claims." Kinney, 159 Wn.2d at 842.

Collateral Attack

As a threshold procedural matter, the State contends that this action constitutes a collateral attack by the plaintiffs on their underlying cases and therefore improperly asks one court to interfere in proceedings not before it. We disagree.

The common law priority of action rule "provides that the first court to obtain jurisdiction over a case possesses exclusive jurisdiction to the exclusion of other coordinate courts." Atl. Cas. Ins. Co. v. Oregon Mut. Ins. Co., 137 Wn. App. 296, 302, 153 P.3d 211 (2007). "[I]ts authority continues subject only to the appellate authority until the matter is finally and completely disposed of." State

4

ex rel. Greenberger v. Superior Court for King County, 134 Wash. 400, 401, 235 P. 957 (1925). But the rule applies only where there is "identity of subject matter, relief, and parties between the actions." Am. Mobile Homes of Wash., Inc. v. Seattle-First Nat'l Bank, 115 Wn.2d 307, 317, 796 P.2d 1276 (1990).

Here, there is no identity of subject matter, requested relief, or parties between the actions. The plaintiffs do not ask the court to decide the issues of fact or law that are the subject of their underlying cases or directly interfere in those proceedings in any way. What relief the plaintiffs do request is systemic in nature, rather than targeted at their preexisting cases. Furthermore, the parties among the cases are also not identical; the State is the only named defendant here. The priority of action rule therefore does not bar this lawsuit.

Power to Compel Legislative Funding

We are asked whether private litigants who assert that their trials have been delayed because of an underfinanced court system's lack of capacity may sue the State in order to compel the judiciary's more ample funding by the legislature. We conclude that they may not. The judiciary possesses the inherent power to compel the legislature to better fund the courts. But exercise of this power is necessarily limited by the careful balance of powers between the branches. These limitations express themselves in part by allowing only one entity to bring this sort of lawsuit: the judiciary. More generally, no other right or power permits the plaintiffs' requested remedy. A lawsuit brought by members of the public to compel specific legislative exercise of its power over funding may

5

only be sustained under our state constitution's public education mandate, not under the provisions relied on by the plaintiffs in this case.

      1.  <u>Structural Constitutional Principles</u>

The doctrines of separation of powers, checks and balances, and inherent judicial powers are "three interrelated . . . constituents of our governmental framework" that inform determinations of when one branch may interfere with the actions of another. <u>In re Salary of Juvenile Director</u>, 87 Wn.2d 232, 237-38, 552 P.2d 163 (1976). The judiciary is empowered by these doctrines to compel the legislature to provide greater funding for the courts when they are unconstitutionally under resourced. <u>Id.</u> at 245. The plaintiffs contend that they fall within a "zone of interest" arising from this power that supports their lawsuit because court underfunding "impairs [the judiciary's] existence as a co-equal branch, in violation of the constitutional guarantee of separation of powers." The State, on the other hand, contends that these doctrines entirely prohibit the plaintiffs' lawsuit because any exercise of this power constitutes a disfavored judicial interference in legislative functions. We hold that only the judiciary may wield its inherent power to compel the legislature to better fund the courts.

The three doctrines are as much philosophical and political constructs as they are legal ones. <u>Juvenile Director</u>, the seminal Washington case addressing them, conducts an examination of their history and purpose and is the basis for much of the following analysis. <u>Id.</u> at 236-51. That being so, a brief summary of the case's facts is appropriate. It concerned the appeal from a superior court

6

No. 84142-4-I/7

order enjoining the board of county commissioners of Lincoln County to pay a court-appointed employee, the director of juvenile services, a higher wage. Id. at 234-35. The case was brought by the superior court of Lincoln County but heard by a superior court judge from another county. Id. at 233. The Washington Supreme Court, in an opinion written by Justice Utter, reversed the superior court's order because the judicial plaintiffs had not met the high burden needed for the judiciary to compel another branch to fund the courts. Id. at 251.

To start, "[a]ny inquiry into the propriety of court action to compel funding of its own functions must begin with an examination of the theoretical underpinnings of the doctrines of separation of powers, checks and balances, and inherent judicial power." Id. at 237. The separation of powers doctrine was first expressed in its modern form by eighteenth century English and French scholars including John Locke and Baron de Montesquieu. Id. at 238. At its core is the notion that exercise of three fundamental governmental powers—writing laws, executing laws, and judging laws' application—should be divided among three separate institutions of government (respectively, the legislative, executive, and judicial branches). See id. at 238-39.[2] This division came to be embodied in the provisions of the state and federal constitutions of the United States. Id. at 239-40. Though it is not a "definitive guide to intergovernmental relations," the separation of powers doctrine is still " 'the dominant principle of the American

---

[2] Though, with that said, "[i]t is an oversimplification to view the doctrine as establishing analytically distinct categories of government functions," some overlap between and among the functions has always existed. Id. at 242.

No. 84142-4-I/8

political system,' " invoked by the courts as a heuristic to help decide matters throughout the history of American jurisprudence. Id. at 240 (collecting federal and Washington cases) (quoting GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC 1776-1787, at 449 (1969)).

The related doctrine of checks and balances suggests that a total separation of powers among the three branches is too broad a division of authority. It proposes that good government is better assured by allowing the branches to check each other's exercise of powers in certain circumstances in order to stop a single branch from overreaching. Id. at 240-42. Thus, among other checks and balances, the executive possesses a veto power over legislation, the legislature possesses the power of the purse, and the court may interpret the constitution and laws. Id. at 241-42.

Checks relevant in this case are both judicial and legislative. On the one hand, "[i]t is emphatically the province and duty of the judicial department to say what the law is" and thereby declare legislative or executive actions unconstitutional. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803). That this function be fulfilled is crucial, since "[w]ithout this, all the reservations of particular rights or privileges would amount to nothing." THE FEDERALIST No. 78 (Alexander Hamilton). On the other hand, the Washington legislature controls appropriations, including appropriations funding the other branches. WASH. CONST. art. VIII, § 4.[3]

---

[3] Governing appropriations in Washington:

8

The judiciary's crucial functions are therefore inextricably interdependent with the functions of the legislature's appropriations power. The exercise of checks is, as a result, delicate and circumstance specific:

> The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635, 72 S. Ct. 863, 870, 96 L. Ed. 1153 (1952) (Jackson, J. concurring).

Not having either the power of appropriations or veto, the judiciary is "the only branch excluded from participation in the formation and adoption of the government budget. Such exclusion makes the courts vulnerable to improper checks in the form of reward or retaliation." Juvenile Director, 87 Wn.2d at 244 (providing a historical parallel, "the use of the King's purse to obtain the loyalty of Parliament").

But the independence of the courts to perform their structural function depends on funding, and so, "separation of powers also dictates that the judiciary

---

No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within one calendar month after the end of the next ensuing fiscal biennium, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum.

9

be able to ensure its own survival when insufficient funds are provided by the other branches." Id. at 244-45. The courts therefore must—as a function not of any positive constitutional grant of power, but instead because of the underlying structure of the constitution—possess an inherent power to compel funding from the other branches. Id. at 245. This power "may be exercised *by the branch* to protect *itself* in the performance of its constitutional duties." Id. at 245 (emphases added).

The fragility of the courts' inherent power to compel funding is readily apparent. Inter-branch conflict arising out of the power's use may have "an adverse effect on working relations between" the judiciary and the other branches of government. Id. at 247-48. This may take the form of more funding battles, court-packing, jurisdiction stripping, altered methods of judicial selection, and retaliation against the judge(s) who permitted the forced funding. See id. at 248. Backlash could affect the judiciary's ability to fulfil its constitutional duties more dramatically than underfunding ever did. Additionally, an exercise of the power to compel funding may cause the judiciary to lose its credibility in the eyes of the public, id. at 248, a particular concern at this point in our history. This dictates caution in any conflict between the judiciary and other branches.

Further recommending a restrained application of this power is recognition of the inherently political, and inherently difficult, nature of "allocation of available[, finite] monetary resources by representatives of the people elected in a carefully monitored process." Id. at 248. The judiciary, a non-political branch

10

No. 84142-4-I/11

comprising officials not always selected in a proportionally representative manner, is less sensitive to the will of the people.  Id. at 249.  Its single-minded focus on its own funding may as a result risk depriving other crucial services of funds, a distribution already carefully considered by a more representative branch.  Id. at 248-49.

This may be the case even in those instances where the judiciary is truly unable to fulfil its constitutional duties.  Real harm can be caused by court underfunding, just as it can be caused by the underfunding of many other important governmental services.  Litigation, though, is an inferior mechanism to remedy this harm.  It focuses only on the parties involved, ignoring any broader context.  Cases such as this one, for example, cannot take into account the difficulties faced by the legislature when deciding how to apportion resources.  And so they ignore the chance that even if the plaintiffs prevail, restoring court funding, they may do so at the cost of harms caused by the resulting more severe underfunding of other services.  A central problem with permitting citizen suits against the legislature to fund the courts becomes one of imbalance: the courts could receive financing at the cost of other agencies that themselves have no inherent power to compel their own funding.[4]

---

[4] As counsel for the State noted at argument: "[T]he heart of the problem . . . is that private litigants don't represent the interests of the public as a whole, they represent their own interests."  Wash. Court of Appeals oral argument, Ralston v. State, No. 84142-4-I (Sept. 27, 2022), at 16 min., 23 sec., audio recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2022091074/?eventID=2022091074.

11

Juvenile Director therefore concluded that a high standard is demanded where the courts' inherent power to compel their own funding from the legislature is invoked. Id. at 249-50. The power "is to be exercised only when established methods fail or when an emergency arises." Id. at 250. Juvenile Director reversed because there was no proof that underfunding "was so inadequate that the court could not fulfill its duties," nor that "an increase [in funding] was reasonably necessary for the efficient administration of justice." Id. at 252.

The fundamental structural concerns of Juvenile Director control resolution of this case. The courts' inherent power to compel their own funding is appropriately exercised rarely and only by the courts themselves. See Zylstra v. Piva, 85 Wn.2d 743, 748, 539 P.2d 823 (1975) ("The court cannot . . . relinquish either its power or its obligation to keep its own house in order."). Pragmatic worries about destabilization of the delicately balanced co-equal branches abound. These worries are not disposed of simply because the lawsuit giving rise to an exercise of this power is brought by private litigants rather than the courts. Any exercise of the power would still be a judicial function, and any protestation otherwise would appear to reasonable observers to be a Trojan horse. Litigants may not wield the judiciary's power in its stead, and the judiciary may not, for its part, delegate its power in an attempt to disguise its use.

12

No. 84142-4-I/13

We therefore conclude that the courts' inherent power to use litigation to compel more robust court funding from the legislature inheres only in the judiciary and cannot be invoked by private litigants.[5]

2. General Limitations on Parties' Power to Compel Legislative Funding

Nor can the plaintiffs rely on any other authority to sustain their lawsuit. The limits imposed on exercise of the courts' inherent powers are consistent with our more general refusal to compel funding from the legislature regarding *any* right or policy. See Ellensburg v. State, 118 Wn.2d 709, 718, 826 P.2d 1081 (1992) ("The power of appropriation is vested in the Legislature. It is the rare case where the judiciary interferes with that power."); Rocha v. King County, 195 Wn.2d 412, 431, 460 P.3d 624 (2020) (declining to compel greater compensation for jurors); Aji P. by & through Piper v. State, 16 Wn. App. 2d 177, 193-94, 480 P.3d 438 (2021) (declining to compel the State to engage in, and therefore fund, certain environmental policies). This refusal is, like the limitations on the courts' inherent powers, consistent with our general approach to the separation of powers, which disfavors "the activity of one branch invad[ing] the prerogatives of another." Putman v. Wenatchee Valley Med. Ctr., P.S., 166 Wn.2d 974, 985, 216 P.3d 374 (2009).

---

[5] At argument, the plaintiffs argued that "this is . . . not an action against the legislature. . . . It is actually against the State, because the State has responsibility for making sure that the judiciary is adequately funded." Wash. Court of Appeals oral argument, supra, at 20 min., 22 sec. Because this action asks for exercise of the appropriations power reserved for the legislature, this is a distinction without a difference.

13

No. 84142-4-I/14

The one narrow, guarded exception to this rule exists under Washington Constitution article IX, section 1, which creates an individual positive right to education funding enforceable through citizens' lawsuits. Seattle Sch. Dist. No. 1 v. State, 90 Wn.2d 476, 510, 585 P.2d 71 (1978) (not ordering any particular action from the legislature, simply concluding that the State was in breach of its duty and the legislature should act); see also McCleary v. State, 173 Wn.2d 477, 518, 269 P.3d 227 (2012) (framing right to education as a "positive right").

That right is not at issue here, but Seattle School District No. 1 is nonetheless instructive. Article IX, section 1 states in relevant part: "It is the paramount duty of the state to make ample provision for the education of all children residing within its borders." WASH. CONST. art. IX, § 1. Seattle School District No. 1, relying on this language, held that the provision, because of that duty, "creates a correlative right on behalf of all resident children." 90 Wn.2d at 510. The court came to this conclusion via a careful textual analysis, giving serious consideration to the words "paramount," "duty," and "ample provision." Seattle Sch. Dist. No. 1, 90 Wn.2d at 516.

Importantly for our purposes in this case, the court in Seattle School District No. 1 emphasized that article IX, section 1 is "unique." 90 Wn.2d at 510. No similar duty and correlative rights arise under other provisions not "constitutionally paramount." Seattle Sch. Dist. No. 1, 90 Wn.2d at 523. And there can be no other "paramount" right because, first, none other is described in our constitution and, second, "[w]hen a thing is said to be paramount, it can only

14

No. 84142-4-I/15

mean that it is more important *than all other* things concerned." Seattle Sch.

Dist. No. 1, 90 Wn.2d at 510-11 (emphasis added) (quoting BERGEN EVANS &

CORNELIA EVANS, A DICTIONARY OF CONTEMPORARY AMERICAN USAGE 350 (1957)).

The plaintiffs invoke Washington Constitution article I, section 10[6] and

Washington Constitution article I, section 21,[7] arguing that each of these

constitutional provisions creates a similar duty that permits this lawsuit and the

remedy of compelled funding.  But those invocations are unavailing as a result of

the exclusive language in Seattle School District No. 1.  Neither provision can

permit private litigants to compel funding; only article IX, section 1 authorizes that

sort of action.  The plaintiffs bring their action under the UDJA, arguing that the

State's failure to fund the courts violates article I, section 10 and article I,

section 21.  But to have recourse to the UDJA, the interests litigants seek to

protect must be within that zone of interests protected or regulated by a relevant

statute or constitutional guarantee.  Grant County Fire Prot. Dist. No. 5 v. Moses

Lake, 150 Wn.2d 791, 802, 83 P.3d 419 (2004).  The constitutional provisions on

which plaintiffs rely, however, do not impose on the legislature a duty to act

enforceable by private litigants.

---

[6] "Justice in all cases shall be administered openly, and without unnecessary delay."

[7] "The right of trial by jury shall remain inviolate, but the legislature may provide for a jury of any number less than twelve in courts not of record, and for a verdict by nine or more jurors in civil cases in any court of record, and for waiving of the jury in civil cases where the consent of the parties interested is given thereto."

No. 84142-4-I/16

Finally, plaintiffs argue that they have standing under the UDJA not because they stand within a protected zone of interests, but because the issue of court funding is one of great public interest.

> Where the question is one of great public interest . . . and where it appears that an opinion of the court will be beneficial to the public and to other branches of the government, the court may exercise its discretion and render a declaratory judgment to resolve a question of constitutional interpretation.

Seattle Sch. Dist. 1, 90 Wn.2d at 490. But public interest standing is extended to ensure that issues do not escape review. Grant County, 150 Wn.2d at 803. Thus, in Yakima County (West Valley) Fire Protection District No. 12 v. Yakima, the court did not extend standing to a fire protection district where its arguments could be made as well or better by others who had entered into the same utility agreement with the city of Yakima. 122 Wn.2d 371, 380-81, 858 P.2d 245 (1993). Here, where the courts themselves are more knowledgeable and better positioned than members of the public to address the systemic underfunding alleged by the plaintiffs, we do not extend public interest standing to them.

## CONCLUSION

Plaintiffs' counsel stated at the beginning of oral argument that individuals are "at the mercy of the legislature" if an underfunded judiciary proves unable to resolve disputes. While this may be true, it is hardly a state of affairs unique to court funding; the legislature is given the power to tax and spend, and with it the responsibility to deliberate carefully and apportion funds appropriately. It, not the courts, is the proper forum for debates about the expenditure of limited public resources. Where it errs, voters are not left without recourse, but instead have

16

the power to correct it through the democratic political process. Where it errs by underfunding the courts, the judiciary is empowered to defend its institutional purpose. But that the judiciary exists to serve public interests does not mean that the public may compel it to use its inherent power to order the legislature to act.

We affirm.

Smith, A.C.J.

WE CONCUR:

Andrus, C.J.          Mann, J.